ACCEPTED
03-15-00497-CV
7774271
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/10/2015 5:02:33 PM
JEFFREY D. KYLE
CLERK

Case Number 03-15-00497-CV

IN THE THIRD DISTRICT COURT OF APPEALS
at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/10/2015 5:02:33 PM
JEFFREY D. KYLE
Clerk

KAREN E. LANDA,

Appellant,

v.

CHARLES L. FARRIS,

Appellee.

From Cause No. D-1-GN-14-004469 in the 98th Judicial District Court
Of Travis County, Texas

## APPELLEE'S BRIEF

THE CRONFEL FIRM
Guillermo Ochoa-Cronfel
State Bar No. 15175600
2700 Bee Caves Road, Suite 103
Austin, Texas 78746
Telephone:  (512) 347-9600
Facsimile:  (512) 347-9911
Guillermo@thecronfelfirm.com

ATTORNEYS FOR APPELLEE

**ORAL ARGUMENT REQUESTED**

**November 10, 2015**

## Table of Contents

INDEX OF AUTHORITIES…………………………………………...……...3

STATEMENT OF THE CASE………………………………………..……7

STATEMENT REGARDING ORAL ARGUMENT………………..……….…8

ISSUES PRESENTED.......................................................................................9

STATEMENT OF FACTS…………………………………………..……...10

SUMMARY OF THE ARGUMENT………………………………..……13

ARGUMENT AND AUTHORITIES………………………………….…14

    A. Standard of Review…………………………………...……...……....14

    B. The Texas long-arm statute…………………………………..18

    C. Landa did not preserve any error with respect to whether or not Farris met his initial burden to bring her under the Texas long-arm statute. Moreover, Farris's First Amended Petition contains sufficient personal jurisdictional allegations to meet that initial burden. (Reply to Appellant's Issue 1)......................................................................19

    D. Landa has waived this point of error pursuant to Tex. R. App. P. 38.1(h), as it is inadequately briefed. Moreover, there is legally and factually sufficient evidence in the record to support a finding by the trial court that it has specific jurisdiction over Landa. (Reply to Appellant's Issue 2)……………………………………………….…23

    E. Landa has waived this point of error pursuant to Tex. R. App. P. 38.1(h), as it is inadequately briefed. Moreover, there is legally and factually sufficient evidence in the record to support a finding by the trial court that it has general jurisdiction over Landa. (Reply to Appellant's Issue 3)………………………………………………………34

CONCLUSION…..............................................................................38

PRAYER...............................................................................39

Certificate of Compliance..................................................41

Certificate of Service.......................................................41

Appendix..........................................................................42

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*BMC Software Belgium, N.V. v. Marchand*,
    83 S.W.3d 789 (Tex. 2002)………………….……..14, 15, 16, 18, 26, 27, 36

*Benoit v. Wilson,*
    279 S.W.2d 792 (Tex. 1951)……………………………………………..17

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)……………………………………...……..26, 27

*CSR Ltd. v. Link,*
    925 S.W.2d 591 (Tex. 1996)………………………………….....27, 36

*Carney v. Roberts Inv. Co.*,
    837 S.W.2d 206 (Tex.App.-Tyler 1992, writ denied)……………………….16

*Citrin Holdings, LLC v. Minnis,*
    305 S.W.3d 269 (Tex.App.-Houston [14th Dist.]
    2009, no pet.)……………………………………………..26, 27, 31, 32, 33

*Daimler AG v. Bauman,*
    134 S.Ct. 746 (2014)………………………………………………..14

*Diversicare Gen. Partner, Inc. v. Rubio,*
    185 S.W.3d 842 (Tex. 2005)……………………………….…………..23

*Ennis v. Loiseau*,
    164 S.W.3d 698 (Tex.App.-Austin 2005, no pet.)……....15, 16, 17, 19, 20, 22

*French v. Glorioso,*
    94 S.W.3d 739 (Tex.App.-San Antonio 2002, no pet.)…………………16, 17

*GFTA Trendanalysen B.G.A. Herrdum GMBH & Co., K.G. v. Varme,*
    991 S.W.2d 785 (Tex. 1999)…………………………………………......20

*Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,*
    815 S.W.2d 223 (Tex. 1991)……………….…………….………18, 19, 27

*Happy Harbor Methodist Home, Inc. v. Cowins,*
    903 S.W.2d 884 (Tex.App.-Houston [1st Dist.] 1995, no writ)..……….…23, 25

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984)………………………………………….....26, 27

*Helitrans Company v. Rotorcraft Leasing Co., LLC,*
    No. 01-13-00145-CV, 2015 WL 593310 (Tex.App.-Houston [1st Dist.]
    Feb. 12, 2015, no pet.)(mem.op)………………….…………23, 24

*Holt Atherton Indus., Inc. v. Heine,*
    835 S.W.2d 739 (Tex. 1992)…………………………………………..16

*In re D.M.D.,*
    No. 04-09-00370-CV, 2009 WL 4861171 (Tex.App.-San Antonio
    Dec. 16, 2009, no pet.)(mem.op)……………………………………24

*In re W.E.R.,*
    669 S.W.2d 716 (Tex. 1984)………………………………….........16

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945)…………………………………………………...26

*Kawasaki Steel Corp. v. Middleton,*
    699 S.W.2d 199 (Tex. 1985)……………….…..…………..15, 19, 20

*McDonald v. Dankworth,*
    212 S.W.3d 336 (Tex.App.-Austin 2006, no pet.)………………………….17

*McKanna v. Edgar,*
    388 S.W.2d 927 (Tex. 1965)…………………………………………..15

*Michiana Easy Livin' Country, Inc. v. Holten,*
    168 S.W.3d 777 (Tex. 2005)………………………….....26, 27, 32, 33

*Moki Mac River Expeditions v. Drugg,*
    221 S.W.3d 569 (Tex. 2007)………………………………..26, 27, 36

[4]

*Nogle & Black Aviation, Inc. v. Favaretto,*
    290 S.W.3d 277 (Tex.App.-Houston [14th Dist.] 2009, no pet.)…………....32

*PHC-Minden, L.P. v. Kimberly-Clark Corp.,*
    235 S.W.3d 163 (Tex. 2007)………………………………………………..14

*Pillai v. Pillai,*
    No. 07-14-00379-CV, 2015 WL 1221394 (Tex.App.-Amarillo
    March 16, 2015, no pet.)(mem.op)…………………….……...…29, 30, 31, 33, 34

*Plas-Tex, Inc. v. U.S. Steel Corp.,*
    772 S.W.2d 442 (Tex. 1989)……………………………….…………….17

*Pool v. Ford Motor Co.,*
    715 S.W.2d 629 (Tex. 1986)…………………………………………..17

*Retamco Operating, Inc. v. Republic Drilling Co.,*
    278 S.W.3d 333 (Tex. 2009)…………………………………….....33, 34

*Ryan v. Abdel-Salam,*
    39 S.W.3d 332 (Tex.App.-Houston [1st Dist.] 2001, pet. denied)…………..25

*Sisters of Incarnate Word, Houston, Tex. v. Gobert,*
    992 S.W.2d 25 (Tex.App.-San Antonio 1997, no pet.)……………..……….23

*Small v. Small,*
    216 S.W.3d 872 (Tex.App.-Beaumont 2007, pet. denied)………….…….25, 26

*Standard Fire Ins. Co. v. Morgan,*
    745 S.W.2d 310 (Tex. 1987)……………………………………………16

*Turner Schilling, L.L.P. v. Gaunce Mgmt.,*
    247 S.W.3d 447 (Tex.App.-Dallas 2008, no pet.)…………………….....32, 33

*U-Anchor Advertising, Inc. v. Burt,*
    553 S.W.2d 760 (Tex. 1977)……………………………….……18, 19

*Worford v. Stamper,*
    801 S.W.2d 108 (Tex. 1990)……………………………………..16

[5]

*Wright v. Sage Engineering, Inc.,*
     137 S.W.3d 238 (Tex.App.-Houston [1st Dist.] 2004, pet. denied)…….15, 22

*Wyatt v. Wyatt,*
     104 S.W.3d 337 (Tex.App.-Dallas 2003, no pet.) …………………..…..17

*Zac Smith & Co. v. Otis Elevator Co.,*
     734 S.W.2d 662 (Tex. 1987)…………………………………………..16

**Statutes, Rules and Other Authorities**

Tex. Civ. Prac. & Rem. Code §§17.041-.045………………………..……….18

Tex. Civ. Prac. & Rem. Code §17.042……………………………….……...18

Tex. Civ. Prac. & Rem. Code §51.014(a)(7)…………………………...…..…15

Tex. R. App. P. 9.4(i)…...............................................................................41

Tex. R. App. P. 28.1(c)…………......…………………………….............….7

Tex. R. App. P. 38.1(h)…………......…………………..…...........9, 13, 14, 23, 34

# STATEMENT OF THE CASE

*Nature of the case:* Plaintiff/Appellee Charles L. Farris ("Farris") made numerous loans to Defendant/Appellant Karen E. Landa ("Landa") from late 2010 through February, 2011, including a loan of approximately $90,000.00, which Landa utilized as the down payment on a purchase of real property in Iowa. After attempting, unsuccessfully, to obtain repayment of the above-referenced loans, Farris brought suit against Landa alleging breach of contract, fraud/fraud in the inducement, and quantum meruit.

*The course of the proceedings below:* Landa filed her Special Appearance on December 22, 2014. The parties conducted discovery limited to the issues relating to Landa's Special Appearance, and the trial court conducted a hearing on Landa's Special Appearance on July 2, 2015, during which the trial court heard and considered the testimony of both Farris and Landa, as well as the documentary evidence admitted by the parties.

*The trial court's disposition of the case:* On July 21, 2015, the trial court entered its Order Denying Special Appearance of Defendant, Karen E. Landa. Landa perfected this appeal by timely filing her notice of appeal on August 6, 2015. On August 11, 2015, Landa filed a Motion for Enlargement of Time Pursuant to Rule 5, and attendant Request for Findings of Fact and Conclusions of Law. On August 12, 2015, the trial court granted Landa's extension request, and declined to issue findings of fact and conclusions of law pursuant to Tex. R. App. P. 28.1(c). Landa subsequently filed; a Supplemental Request; a Notice of Past Due Findings of Fact and Conclusions of Law; and, an Amended Notice Concerning Findings of Fact and Conclusions of Law. The trial court did not issue findings of fact and conclusions of law.

[7]

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves the denial of Appellant Landa's Special Appearance, which by its nature turns on the jurisdictional touchstone of 'purposeful availment'. Oral argument would assist the Court in analyzing this fact-specific inquiry based on the realities of the particular dispute.

# ISSUES PRESENTED

Reply to Issue 1:   Landa did not preserve any error with respect to whether or not Farris met his initial burden to bring her under the Texas long-arm statute. Moreover, Farris's First Amended Petition contains sufficient personal jurisdictional allegations to meet that initial burden.

Reply to Issue 2:   Landa has waived this point of error pursuant to Tex. R. App. P. 38.1(h), as it is inadequately briefed. Moreover, there is legally and factually sufficient evidence in the record to support a finding by the trial court that it has specific jurisdiction over Landa.

Reply to Issue 3:   Landa has waived this point of error pursuant to Tex. R. App. P. 38.1(h), as it is inadequately briefed. Moreover, there is legally and factually sufficient evidence in the record to support a finding by the trial court that it has general jurisdiction over Landa.

[9]

**STATEMENT OF FACTS**

Defendant/Appellant, Karen Landa ("Landa") misstates the facts in her brief, presenting the evidence in the manner she *wished* the trial court would have considered the evidence. That is, with little to no attention paid to any evidence that would tend to disprove the grounds (or lack thereof) for her special appearance. The trial court's denial of Landa's special appearance shows that the trial court rejected her version of the facts related to personal jurisdiction in this case.

Landa resided and worked in Travis and/or Williamson County, Texas for approximately thirty (30) years, between 1980 and 2010. II RR 34. Landa was married, had children, and was divorced in Travis and/or Williamson County, Texas during that time. II RR 34. Landa's marriages/divorces during that time included her marriage to, and subsequent divorce from, Plaintiff/Appellee, Charles L. Farris ("Farris"), with whom she also had a son and daughter. II RR 34, 48 & 96. Landa's work history during that time included work in the insurance industry, obtaining a Texas insurance license in 1986/87, which she holds to this day. II RR 34-35.

From the summer of 2010 through late October, 2010, Landa spent time residing in both Michigan and New York. II RR 38-39. On October 31, 2010, Landa moved to Iowa to stay with her mother, who was in poor health. II RR 39. During the latter half of 2010 and her travels from Michigan to New York to Iowa, Landa continued to store most of her personal belongings in five (5) PODS storage

[10]

containers in Austin, Travis County, Texas, through at least December, 2010, at a cost of $1,500+ per month. II RR 39-41. During late 2010 and early 2011, while staying with her mother, Landa continued to look for her own place in Iowa. II RR 41.

It was during late November/December, 2010, that Landa and Farris discussed Farris providing Landa money for the down payment on a home. Landa testified that she began discussing with Farris the idea of her trying to find a home in Iowa in November of 2010, which led to further discussions between the two of them during a weekend meeting in Dallas, Texas in December, 2010. II RR 46-48 & 50-51. Farris testified that at the referenced December, 2010, weekend meeting the parties discussed for the first time Landa seeking money for the down payment on a home in Iowa, and reached an agreement regarding Farris's loaning money to Landa for that prospective down payment on a home. II RR 96-98. Moreover, from December, 2010, through February, 2011, Landa engaged in discussions with Farris regarding numerous aspects of his provision of the money for the down payment in person, via e-mail, and via telephone. II RR 65-66. Landa further represented to Farris that part of their agreement regarding the down payment funds provided by Farris was that Farris's name would appear on the deed for the house, but despite Landa's representation, Farris's name was stricken from the deed. II RR 66. Ultimately,

[11]

Farris provided Landa the agreed upon down payment (on that, the parties agree), and Landa closed on a home in late February, 2011. II RR 41.

Following Landa's closing on the home, she and Farris continued to have constant contact regarding the transaction. II RR 68. Those contacts took the form of additional e-mail communications, text communications, and telephone communications from Landa (in Iowa) to Farris (in Texas), as well as additional in-person contacts between Landa and Farris in Austin, Texas. II RR 68-69, 73-74, 77-79, 103-105 & 107-110. After moving back to Austin and residing there from approximately July, 2013, through April, 2014, Landa continued to have contacts with Farris in which (amongst other things) they discussed her paying back the money he had provided. II RR 79-80 & 109-113. In fact, during this time in which she was again living and working in Austin, Landa even did some insurance work on Farris's behalf. II RR 81 & 82.

After Farris's long-running attempts to obtain repayment from Landa ultimately proved unfruitful, he brought suit against her in Travis County, Texas, on his claims for breach of contract, fraud/fraud in the inducement, and quantum meruit. CR 3-7 & 15-22.[1]

---

[1] Plaintiff's Original Petition, and Plaintiff's First Amended Original Petition.

## SUMMARY OF THE ARGUMENT

The trial court did not commit any reversible errors in denying Landa's Special Appearance. First, Landa's complaint regarding the sufficiency of Farris's jurisdictional allegations for the purposes of the Texas long-arm statute fails as; (i) Landa did not properly preserve any potential error in this respect; and, (ii) assuming *arguendo* that she **had** properly preserved any such potential error, Farris's jurisdictional allegations are clearly sufficient to meet the requirements of the Texas long-arm statute and 'notice' pleading. That is, Landa failed to properly preserve any potential error on this point, and moreover, the trial court did not commit error in finding that Farris met the requirements for jurisdictional allegations that would properly invoke the Texas long-arm statute, thus requiring Landa to negate **all** bases for personal jurisdiction.

Second, Landa's complaint regarding the trial court's finding of personal jurisdiction on the basis of specific jurisdiction also fails, as; (i) Landa has waived this point of error pursuant to Tex. R. App. P. 38.1(h), as it is inadequately briefed; and, (ii) there was legally and factually sufficient evidence adduced at the hearing on Landa's Special Appearance demonstrating the minimum contacts necessary for such a finding. Accordingly, the trial court did not err to the extent its denial of Landa's Special Appearance is based on a finding of specific jurisdiction.

[13]

Finally, Landa's complaint regarding the trial court's finding of personal jurisdiction on the basis of general jurisdiction also fails, as again; (i) Landa has waived this point of error pursuant to Tex. R. App. P. 38.1(h), as it is inadequately briefed; and, (ii) there was legally and factually sufficient evidence adduced at the hearing on Landa's Special Appearance demonstrating the minimum contacts necessary for such a finding. Additionally, with respect to this point of error, Landa overstates the Supreme Court's recent holding(s) on general jurisdiction in *Daimler AG v. Bauman*, and further misassociates the Texas Supreme Court's holding(s) in *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, with the notion that the door has been "all but shut" on general jurisdiction based on a defendant's contacts with the forum, when those contacts are not related to the claim.[2] Accordingly, the trial court did not err to the extent its denial of Landa's Special Appearance is based on a finding of general jurisdiction.

In sum, the trial court did not commit any reversible error in denying Defendant's Special Appearance.

## ARGUMENT AND AUTHORITIES

### A. Standard of Review.

"The plaintiff bears the initial burden of pleading sufficient allegations to

---

[2] *Daimler AG v. Bauman*, 134 S.Ct. 746 (2014); *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163 (Tex. 2007).

bring a nonresident defendant within the provisions of the long-arm statute." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002), citing *McKanna v. Edgar*, 388 S.W.2d 927, 930 (Tex. 1965).  In the instant case, the trial court found, explicitly and implicitly, that plaintiff carried this burden.  II RR 31; CR 31.  Once the plaintiff has met this burden, the burden shifts to the defendant challenging jurisdiction to negate all jurisdictional bases.  *BMC Software*, 83 S.W.3d at 793, citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985).

In an interlocutory appeal of a trial court's order denying a special appearance, the appellate court reviews *de novo* the question of whether a court has personal jurisdiction over a defendant, as this is a question of law.  *Ennis v. Loiseau*, 164 S.W.3d 698, 706 (Tex.App.-Austin 2005, no pet.), citing Tex. Civ. Prac. & Rem. Code §51.014(a)(7); *BMC Software*, 83 S.W.3d at 794.  Notwithstanding this, "Questions of fact must frequently be resolved by the trial before reaching the jurisdictional inquiry," and "While a special appearance is not the appropriate stage to make a determination on liability, we must consider facts regarding the defendant's actions that could foreseeably cause harm in Texas in order to determine whether the defendant should have anticipated being haled into a Texas court." *Ennis*, 164 S.W.3d at 706, citing *BMC Software*, 83 S.W.3d at 794; *Wright v. Sage Engineering, Inc.*, 137 S.W.3d 238, 251 (Tex.App.-Houston [1st Dist.] 2004, pet. denied).

[15]

Further, when a trial court denies a special appearance and does not issue findings of fact and conclusions of law, "…all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795, citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex. 1987); *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984); see also, *Ennis*, 164 S.W 3d at 706. And when, as here, the clerk's and reporter's records are included on appeal, such "…implied findings may be challenged for both legal and factual sufficiency." *Ennis*, 164 S.W.3d at 706, citing *BMC Software*, 83 S.W.3d at 795.

A legal sufficiency challenge is also known as a 'no evidence' challenge and in deciding a 'no evidence' point, an appellate court must consider only the evidence, and reasonable inferences therefrom, which, when viewed in the most favorable light, support the fact-finder's answers, rejecting and disregarding all other evidence and reasonable inferences therefrom. *Carney v. Roberts Inv. Co.*, 837 S.W.2d 206, 208 (Tex.App.-Tyler 1992, writ denied), citing *Standard Fire Ins. Co. v. Morgan*, 745 S.W.2d 310, 311 (Tex. 1987); see also, *Ennis*, 164 S.W.3d at 706, citing *French v. Glorioso*, 94 S.W.3d 739, 744 (Tex.App.-San Antonio 2002, no pet.). Moreover, "…if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails." *BMC Software*, 83 S.W.3d at 795, citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992).

[16]

A factual sufficiency, or "insufficient evidence" challenge, requires the reviewing court to, "…consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside." *McDonald v. Dankworth,* 212 S.W.3d 336, 339 (Tex.App.-Austin 2006, no pet.), citing *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). A factual sufficiency challenge should be sustained, and the appellate court should set aside a trial court's implied finding, "…only if it is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust." *Ennis*, 164 S.W.3d at 706, citing *French,* 94 S.W.3d at 744.

Importantly, when conducting its review, the appellate court is further guided by the following principles:

> "The trial court, as the fact-finder, is the sole arbiter of the witnesses' credibility and the weight that their testimony should be afforded. *Wyatt v. Wyatt*, 104 S.W.3d 337, 340 (Tex.App.-Dallas 2003, no pet.). This Court will not disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence. *Benoit v. Wilson*, 150 Tex. 273, 279 S.W.2d 792, 796 (1951)."
> --*Ennis*, 164 S.W.3d at 706.

Appellant's Brief fails to articulate whether Landa is seeking a legal and/or factual sufficiency review with respect to any particular claimed points of error, and further, fails to review **any** of the evidence or reasonable inferences therefrom that would support the trial court's implied findings underlying its denial of her special

[17]

appearance. Appellee will herein address both legal and factual sufficiency challenges on Appellant's claimed points of error, as both such challenges fail.

**B.     The Texas long-arm statute.**

"The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants." *BMC Software*, 83 S.W.3d at 795, citing Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. Amongst other grounds (which are not articulated in, or expressly limited by, the statute), that statute permits Texas courts to exercise jurisdiction over nonresident defendants "doing business" in Texas:

> "In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident: (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole or in part in this state; or, (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state."
> --Tex. Civ. Prac. & Rem. Code § 17.042.

Further, "…section 17.042's broad language extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *BMC Software*, 83 S.W.3d at 795, citing *U-Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977). As such, Texas courts will, "…rely on precedent from the United States Supreme Court and other federal courts, as well as our own State's decisions, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction." Id. at 795, citing *Guardian Royal*

*Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991); *U-Anchor Adver.*, 553 S.W.2d at 762.

**C.     Landa did not preserve any error with respect to whether or not Farris met his initial burden to bring her under the Texas long-arm statute. Moreover, Farris's First Amended Petition contains sufficient personal jurisdictional allegations to meet that initial burden.   (Reply to Appellant's Issue 1).**

Landa's proposed first point of error, regarding the sufficiency of Farris's jurisdictional allegations, is waived as she did not raise it at the trial court,  "In order to preserve error for appeal, a party must make a timely objection 'with sufficient specificity to make the trial court aware of the complaint' and obtain a ruling on the record."   *Ennis*, 164 S.W.3d at 703, citing Tex. R. App. P. 33.1.   Further, "…defective jurisdictional allegations…must be challenged by a motion to quash, not a special appearance." *Kawasaki Steel*, 699 S.W.2d at 203.  In *Ennis*, this Court examined *Kawasaki* and determined that in "reading *Kawasaki* as a whole" a motion to quash was not required in order to preserve a complaint regarding jurisdictional allegations. *Ennis*, 164 S.W.3d at 704-705.

Nevertheless, *Ennis* does not stand for the proposition that Landa need not have complained **at all** about the sufficiency of Farris's jurisdictional allegations at the trial court level in order to preserve a point of error related to same.  In fact, the *Ennis* court noted amongst the complaints in Ennis's special appearance the assertion that the plaintiff's "jurisdictional pleadings were insufficient". *Ennis*, 164

S.W.3d at 702. Moreover, in a case decided by the Texas Supreme Court after *Kawasaki* (but predating *Ennis*) the Court said regarding *Kawasaki*, "…we did not hold that a party waives a due process challenge for want of minimum contacts by challenging the method of service in the special appearance. To the contrary, although the defendant in Kawasaki had challenged the method of service in its special appearance, we did not suggest that the defendant had thereby waived its contest to jurisdiction based on minimum contacts." *GFTA Trendanalysen B.G.A. Herrdum GMBH & Co., K.G. v. Varme*, 991 S.W.2d 785, 786 (Tex. 1999). That is, to the extent *Ennis* is a correct interpretation of the Texas Supreme Court's ultimate holding in *Kawasaki* regarding whether or not a motion to quash is required in order to preserve a point of error related to the sufficiency of a plaintiff's jurisdictional allegations, the way to preserve such error is to raise it in the special appearance.

In the instant case, Landa did not raise the issue of a potential defect in Farris's jurisdictional allegations in her Special Appearance. CR 9-10. Landa also failed to articulate a complaint regarding this issue at the hearing on her Special Appearance. In fact, on this point Landa's counsel made only the following remarks:

> Mr. Scarborough: All right. Your Honor, as Mr. Cronfel and I have discussed in this case, the burden – initial burden is on him to plead sufficient facts. The Texas Supreme Court in the *Kelly* case in 2010 says, if – and that's a determination for the Court. If he has not and we've proved that she is – the defendant is a resident of another state, which she is, in Iowa, that that's the end of the case. Now, what I've told Mr. Cronfel is this: I've assumed that the Court would

either find that the pleadings are sufficient, or would carry that along, and that the burden immediately shifts to the defendant to prove and negate the facts of the case. So I want to make a short opening statement before we go any further.

The Court:   Are you okay with that, Mr. Ochoa-Cronfel?

Mr. Ochoa-Cronfel:       Yes, ma'am.

The Court:   Okay. Go ahead.
--II CR 8-9.

Mr. Ochoa-Cronfel:       Your honor, one housekeeping matter:   I'm assuming, because we're proceeding in this manner, that the Court is – has taken the position that our pleadings meet the initial burden?

The Court:   Correct.

Mr. Ochoa-Cronfel:       Correct. Thank you very much, Your Honor.

The Court:   I mean, I think that Mr. Scarborough pretty much granted that.

Mr. Scarborough:  Actually, what I said was I assume the Court would either grant it or carry it along. And as I've not heard on the record a ruling on that, so I'm assuming you're carrying it.

The Court:   Okay. I'll carry it on. But I'm assuming that you've met that.
--II CR 31.

Mr. Scarborough:  Since the burden of proof is on me, I get the last word.
--II CR 135.

The foregoing demonstrates that Landa also did not raise a complaint as to the

sufficiency of Farris's jurisdictional allegations during the hearing on her special

[21]

appearance. In fact, the trial court believed that Landa had conceded that point. As such, Landa waived any purported error in this regard.

Assuming *arguendo* that Landa did preserve this point of error, it still fails, as Farris satisfied his burden of pleading sufficient jurisdictional allegations to subject Landa to personal jurisdiction. In determining whether Farris met this burden, his original pleadings, as well as his response to Landa's Special Appearance can be considered by the Court. *Ennis*, 164 S.W.3d, at 705, citing *Wright,* 137 S.W.3d at 249 n. 7.

As was the case in *Ennis*, here Farris's live pleading alleged a number of facts upon which Landa could be subjected to personal jurisdiction, including, but not limited to the following:

1.  Landa engaged in business and committed torts in the State of Texas;
2.  Landa entered into an agreement with a Texas resident, Farris;
3.  Landa and Farris both performed on said agreement, in whole or in part, in Texas;
4.  Landa made misrepresentations to Farris in Texas, in order to induce Farris's performance;
5.  Landa communicated via telephone, text, e-mail, regular mail, and in-person with a Texas resident, Farris, regarding said agreement;
6.  Landa profited from her involvement with Farris, to his detriment;
7.  Landa resided and worked in Austin for the better part of the last twenty-plus years, up to and including parts of 2013-2014; and,
8.  Landa maintained an active insurance license with the Texas Department of Insurance from April, 1987 through April, 2015, including owning and operating her own insurance agency in Austin as recently as 2014.

--CR 15-22, Plaintiff's First Amended Original Petition.

Additionally, Farris also filed a response to Landa's Special Appearance which further detailed why the court had personal jurisdiction over Landa. CR 23-30.

Therefore, Farris satisfied his initial burden of pleading a sufficient basis upon which to subject Landa to personal jurisdiction, and the burden then shifted to Landa to negate all bases for personal jurisdiction. Thus, the trial court did not commit error in this regard.

**D.    Landa has waived this point of error pursuant to Tex. R. App. P. 38.1(h), as it is inadequately briefed. Moreover, there is sufficient evidence in the record to support a finding by the trial court that it has specific jurisdiction over Landa. (Reply to Appellant's Issue 2).**

Initially, with respect to her second point of error, Landa has failed to adequately brief same as required by Tex. R. App. P. 38.1(h), and thus, has waived this point of error. "A party asserting error on appeal bears the burden of showing that the record supports the contention raised, and of specifying the place in the record where matters upon which she relies or of which she complains are shown. *Happy Harbor Methodist Home, Inc. v. Cowins*, 903 S.W.2d 884, 886-87 (Tex.App.- Houston [1ˢᵗ Dist.] 1995, no writ); Tex. R. App. P. 38.1(h). Where this burden is not carried, the party waives the point of error. *Happy Harbor*, 903 S.W.2d at 886-87." *Sisters of Charity of Incarnate Word, Houston, Tex. v. Gobert*, 992 S.W.2d 25, 31 (Tex.App.-San Antonio 1997, no pet.), disapproved of on other grounds by *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842 (Tex. 2005); see also, *Helitrans Company v. Rotorcraft Leasing Co., LLC*, No. 01-13-00145-CV, 2015 WL

[23]

593310, at *3 (Tex.App.-Houston [1st Dist.] Feb. 12, 2015, no pet.) (mem.op.); *In re D.M.D.*, No. 04-09-00370-CV, 2009 WL 4861171, at *2 (Tex.App.-San Antonio Dec. 16, 2009, no pet.) (mem.op.).

As alluded to in Section A, above, Landa has failed to cite to or analyze **any** of the evidence considered by the trial court that would tend to support its implied findings of fact on this jurisdictional question. In fact, in her discussion on this point of error Landa provides only three (3) citations to the reporter's record which ostensibly support **her** desired interpretation of the evidence, as opposed to addressing how the evidence fails to support the trial court's implied findings. Two of those citations are to her own testimony and one is to Farris's, and even those scant citations to the record are mischaracterized. That is:

1. Landa cites Farris's testimony at II RR 116 in support of the propositions that no contract was entered into by the parties in Dallas because, "…the Parties did not know the amount, the house, or even if a house would be purchased." In fact, Farris's testimony at that citation was only that the parties' meeting in Dallas involved discussions regarding an agreement for him to provide Landa money for her closing on a house in Iowa.

2. Landa cites her own testimony at II RR 52 in support of the propositions that, "…Landa was in Iowa when: (1) she chose the house that would be purchased; (2) decided how much money would be needed; and (3) all negotiations with the lender took place." However, to the extent Farris was involved at all in negotiations with an additional lender in Iowa, Landa's own testimony in this regard is that such discussions took place, for Mr. Farris's part, in Austin. See also II RR 65-66.

3. Landa cites her own testimony at II RR 30 in support of the proposition that, "…the transaction was closed in Iowa." But this misses the point entirely, as the transaction she is referring to is her closing on the house in Iowa. The

[24]

transaction that is relevant for the purposes of this appeal (and the underlying litigation) is the provision of funds from Farris to Landa.

Landa makes only three (3) other record citations in her discussion of this point of error, and those are citations to the clerk's record, and more particularly to Plaintiff's First Amended Original Petition, which doesn't constitute **evidence** that the trial court would have considered in finding that it had specific jurisdiction over Landa. The remainder of Landa's discussion on this point of error is limited to a discussion of various authorities she believes apply to the instant case on the basis of conclusory statements of "fact" regarding the underlying transaction, without citations to support for same in the record.

"When a party fails to include any citation of authority or discussion of **relevant** facts to support its sufficiency contention, 'we will not perform an independent review of the record and applicable law to determine whether the error complained of occurred." *Ryan v. Abdel-Salam*, 39 S.W.3d 332, 336 (Tex.App.-Houston [1st Dist.] 2001, pet. denied), citing *Happy Harbor*, 903 S.W.2d at 886. In short, the foregoing demonstrates that Landa has waived any purported error related to this point, as she has inadequately briefed same.

Assuming *arguendo* that Landa has not waived this point of error as discussed above, her challenge on this point still fails. "Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state; and, (2) the exercise of

[25]

jurisdiction comports with traditional notions of fair play and substantial justice." *Small v. Small*, 216 S.W.3d 872, 876 (Tex.App.-Beaumont 2007, pet. denied), citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *BMC Software*, 83 S.W.3d at 795. Further, "Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction." *BMC Software*, 83 S.W.3d at 795-96, citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14 (1984).

To determine whether the requisite minimum contacts exist to support the exercise of personal jurisdiction, "…the court must determine whether the nonresident defendant 'purposefully availed' itself of the privilege of conducting business in Texas." *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 278 (Tex.App.-Houston [14th Dist.] 2009, no pet.), citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). There are three key principles that the Texas Supreme Court holds govern the purposeful availment analysis:

1. The <u>defendant's</u> contacts with the forum as opposed to another party or third person, so that the defendant does not find itself called into the jurisdiction based solely on another's unilateral acts;
2. Whether the defendant's actions were purposeful, as opposed to random, isolated, or fortuitous; and,
3. That defendant has sought some benefit by availing itself of the privilege of doing business in Texas.

--See *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007); *Michiana Easy Livin'*, 168 S.W.3d at 785; *BMC Software*, 83 S.W.3d at 795; *Citrin Holdings*, 305 S.W.3d at 278-79.

[26]

Indeed, it would be simple enough for a nonresident to, "…purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Michiana Easy Livin'*, 168 S.W.3d at 785 n.34, citing *Burger King*, 471 U.S. at 473; see also, *Moki Mac*, 221 S.W.3d at 575.

As to "fair play and substantial justice" the court should consider, "… (1) the burden on the defendant; (2) the interests in the forum state in adjudicating the dispute; (3) the plaintiff's interests in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and, (5) the shared interest of the states in furthering fundamental substantive social policies." *Citrin Holdings*, 305 S.W.3d at 280, citing *Burger King*, 471 U.S. at 476-77; *Guardian Royal*, 815 S.W.2d at 228. But, "Only in rare cases will the exercise of personal jurisdiction not comport with fair play and substantial justice when a nonresident defendant has purposefully availed itself of the privilege of conducting a business within a forum." *Citrin Holdings*, 305 S.W.3d at 280, citing *Guardian Royal*, 815 S.W.2d at 231. **Specific** jurisdiction, "…is established if the defendant's alleged liability 'aris[es] out of or [is] related to' an activity conducted within the forum." *Moki Mac*, 221 S.W.3d at 576, citing *Helicopteros*, 466 U.S. at 414 n. 8; *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996).

The following evidence adduced at the hearing on Landa's Special Appearance, while not necessarily an exhaustive list, supports the trial court's finding that it has specific jurisdiction over Landa:

1. Both Landa and Farris testified that they met in Dallas in December, 2010, and there discussed (amongst other things) Farris's provision of funds to Landa for the purchase of a home.  II RR 50-51 & 64-65 (Landa); II RR 97-99 (Farris).

2. Farris testified that it was at this meeting in Dallas that he learned for the first time that Landa was seeking money for a down payment on a house.  II RR 97.

3. Both Landa and Farris testified that part of the agreement arising from the meeting in Dallas were representations by Landa that the agreement would include Farris's name being on the deed for the home that Landa would purchase utilizing the funds provided by Farris.  II RR 66 (Landa); II RR 97-98 (Farris).

4. Both Landa and Farris testified that they engaged in additional communications (aside from the meeting in Dallas), via e-mail and telephone, between the December meeting and February, 2011, to discuss Farris's provision of funds to Landa for the purchase of a home.  II RR 65-66 (Landa); II RR 99-101 (Farris).

5. Both Landa and Farris testified that Farris performed, wiring funds from his bank accounts in Austin to a joint bank account in Iowa, to effect the above-referenced provision of funds to Landa.  II RR 67-68 (Landa); II RR 101-103 (Farris); III RR 18-19, Plaintiff's Exh. 6; III RR 20-24, Plaintiff's Exh. 7.

6. Both Landa and Farris testified that, despite Landa's above-referenced representations regarding the deed, and Farris's performance in accordance with the agreement, Farris's name was ultimately stricken from the deed at closing.  II RR 66 (Landa); II RR 104-106 (Farris).

7. Both Landa and Farris testified that they engaged in constant communication regarding the transaction **after** February, 2011 (and indeed, over the course of the next 3+ years) via e-mail, telephone, text, regular mail, and/or in-person

communications in Austin. II RR 68-71, 73-76 & 78-79 (Landa); II RR 103-114 (Farris); III RR 6-8, Plaintiff's Exh. 1; III RR 9-10, Plaintiff's Exh. 2; III RR 25-204, Plaintiff's Exh. 8; III RR 205-206, Plaintiff's Exh. 9.

8. Both Landa and Farris testified that in May, 2012, on a visit to Austin, Landa gave Farris a check in the amount of $15,000.00. II RR 57-58 & 69 (Landa); II RR 107-108 (Farris); III RR 205-206, Plaintiff's Exh. 9.

9. Landa testified that throughout all of the contacts that she had with Farris regarding the transaction, be they in person, by phone, by text, by e-mail, and/or by regular mail, Farris lived in Austin, Texas, and she was aware that she was obtaining funds from a resident of Texas. II RR 65-66.

The record is replete with evidence that suggests, for the purposes of this special appearance, that Landa took actions that constituted her 'doing business' in Texas – such as entering into an agreement with and engaging in frequent communications with Farris, a Texas resident, regarding his provision of funds to her for the purpose of purchasing a home, and traveling to Texas to facilitate those dealings with Farris. Moreover, the evidence also suggests, for purposes of this special appearance, that Landa made misrepresentations to Farris, in Texas, for the purpose of inducing/facilitating Farris's performance in accordance with that agreement. Thus, there is ample evidence from which the trial court could reasonably have found it has specific jurisdiction over Landa in the instant case.

The memorandum opinion from the Amarillo Court of Appeals that Landa relies on, *Pillai v. Pillai,* is easily distinguishable from the instant case on a number of factual bases. *Pillai v. Pillai*, 07-14-00379-CV, 2015 WL 1221394 (Tex.App.-Amarillo March 16, 2015, no pet.) (mem.op.). First, the record in *Pillai* failed to

[29]

disclose which party first broached the subject of a loan or the location of the parties when the subject was broached. *Pillai*, 2015 WL 1221394 at *1. In fact, in *Pillai* the plaintiff actually traveled to Canada regarding the parties' transaction. Here, that is not the case, as the record indicates that the subject of Farris loaning Landa the money at issue was first broached by Landa, was broached by Landa while both parties were in Texas, and moreover, at no point in the parties' ongoing contacts regarding the transaction was Farris not located in Texas. II RR 50-51 & 64-66 (Landa); II RR 97-99 (Farris). Second, while the record in *Pillai* disclosed that the defendant traveled to Texas from Canada on multiple occasions, nothing in the record indicated that **anything** the defendant did on those in-person visits related to the loan transaction. *Pillai*, 2015 WL 1221394 at *1. Here, that is not the case, as the record indicates that on multiple trips to Austin, and during times when Landa was again residing in Austin, Landa and Farris negotiated and/or discussed the transaction, and/or performed (in whole or in part) in accordance with their agreement. II RR 50-51, 57-58, 64-67 & 69 (Landa); II RR 97-99 & 107-108 (Farris); III RR 205-206, Plaintiff's Exh. 9. Third, while additional written communications appeared in the record in *Pillai*, all save one failed to indicate where the parties were when those communications were sent or received. *Pillai*, 2015 WL 1221394 at *1. Here, that is not the case, as the record indicates that at all times, Landa was aware she was communicating with Farris, a Texas resident, with regard

[30]

to the transaction. II RR 65-66. Fourth, the record in *Pillai* does not indicate the geographic location of the bank or bank account from which the funds were sent to the defendant. *Pillai*, 2015 WL 1221394 at *1. Once again, that is not the situation in the instant case, here the record indicates conclusively, that the funds were wired from two accounts of Farris located in Texas. II RR 67-68 (Landa); II RR 101-103 (Farris); III RR 18-19, Plaintiff's Exh. 6; III RR 20-24, Plaintiff's Exh. 7. In short, for virtually every factual basis on which the *Pillai* Court found its record wanting in terms of specific jurisdiction, the record in this case demonstrates evidence in support of the trial court's finding of specific jurisdiction. These factual distinctions serve to illustrate why this case is different than *Pillai*, and why the trial court's exercise of specific jurisdiction in the instant case is proper.

Likewise, Landa's attempt to distinguish the instant case from *Citrin Holdings* is also unavailing. In *Citrin*, the Houston 14th District Court of Appeals found that a nonresident defendant that; (i) contracted with a Texas resident, "…in contemplation of an ongoing business relationship to be performed at least in part in Texas,"; (ii) conducted prolonged discussions with the Texas resident in furtherance of that relationship; (iii) traveled to Texas and met with the Texas resident in the course of those discussions; and, (iv) communicated with the Texas resident in Texas face-to-face, and via telephone, fax, e-mail, and mail, established specific jurisdiction through those contacts. *Citrin Holdings, LLC v. Minnis*, 305 S.W.3d at

[31]

282-83. The *Citrin* Court went on to say, "Here…the circumstances involve multiple Texas contacts over many months in the course of an ongoing relationship that 'was not unilaterally initiated by the Texas resident.' See *Nogle & Black Aviation, Inc. v. Favaretto*, 290 S.W.3d 277, 283 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *cf. Michiana Easy Livin'* 168 S.W.3d at 784. These circumstances demonstrate Citrin's purposeful contact with Texas along with an intent to obtain benefits from those contacts, and they defeat any suggestion that Citrin's business-related presence in Texas was merely 'random, isolated, or fortuitous.'" *Citrin Holdings, LLC*, 305 S.W.3d at 283. As detailed at length above, the evidence in the instant case is similar to that described by the *Citrin* Court. These factual similarities serve to illustrate why, as in *Citrin*, the trial court's exercise of specific jurisdiction in the instant case is proper.

Landa also misfocuses part of her argument on the fact that the parties' agreement in the instant case called for (at least in part) performance by Farris in Texas. Landa cites to an opinion from the Dallas Court of Appeals for her proposition that, "…it does not matter that Farris was to conduct his obligations in the state." Appellant's Brief, at 12, citing *Turner Schilling, L.L.P. v. Gaunce Mgmt.*, 247 S.W.3d 447, 456 (Tex.App.-Dallas 2008, no pet.). While Landa correctly (albeit, incompletely) quotes *Turner Schilling* in this respect - "the plaintiff's performance of part of its contract duties in Texas is not a purposeful contact of the

defendant with Texas," the conclusion she draws from this statement fails to acknowledge the broader jurisdictional issue. Rather, it is the **unilateral** activity of another party or third person that is not relevant to the jurisdictional inquiry. *Turner Schilling*, 247 S.W.3d at 451-52, citing *Michiana Easy Livin'*, 168 S.W.3d at 785; see also, *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009). When the contacts with Texas formed by the nonresident defendant create a contractual relationship between her and the resident plaintiff whereby the plaintiff performs pursuant to the contract, in whole or in part, in Texas, than the analysis of those contacts and their effect (i.e., the plaintiff's performance in Texas) is certainly relevant to the minimum contact analysis. See *Retamco Operating, Inc.*, 278 S.W.3d at 340; *Citrin Holdings, LLC*, 305 S.W.3d at 281. If this were not the case, the Texas long-arm statute itself would be rather precariously placed vis-à-vis constitutional requirements given its definition of 'doing business'.

Finally, one of Landa's more curious arguments with respect to specific jurisdiction centers on whether or not the parties actually made an agreement in Dallas. That is, her contention is that the parties never reached an agreement while Landa was physically in Texas, because they didn't have a meeting of the minds in Texas. This despite the fact that in her own testimony Landa refers to the parties' agreement, and calls it a loan. II RR 66, 69. Nevertheless, Landa's own "exemplar" case, *Pillai* tells us that, "…it is not necessary for the non-resident to appear on Texas

soil for the one contract to suffice." *Pillai*, 2015 WL 1221394 at *2, citing *Retamco Operating, Inc.*, 278 S.W.3d at 339.

As is set forth at length above, whether Landa challenges the trial court's finding of specific jurisdiction under a legal sufficiency analysis, a factual sufficiency analysis, or both, her challenge fails. A complete review of the record demonstrates not only more than a scintilla of evidence in favor of the trial court's finding in this regard, but that the great weight and preponderance of the evidence is in favor of this finding. Thus, the trial court did not commit error in this regard.

**E.    Landa has waived this point of error pursuant to Tex. R. App. P. 38.1(h), as it is inadequately briefed. Moreover, there is sufficient evidence in the record to support a finding by the trial court that it has general jurisdiction over Landa. (Reply to Appellant's Issue 3).**

As with her second point of error, initially, with respect to her third point of error, Landa has failed to adequately brief same as required by Tex. R. App. P. 38.1(h), and thus, has waived this point of error. Again, as alluded to in Section A, above, Landa has failed to cite to or analyze **any** of the evidence considered by the trial court that would tend to support its implied findings of fact on this jurisdictional question. In fact, her discussion on this point of error is even more spartan than was the argument on her second point of error. Landa again provides only three (3) citations to the reporter's record which ostensibly support **her** desired interpretation of the evidence, as opposed to addressing how the evidence fails to support the trial

court's implied findings. Those are citations to her own testimony and exhibits, and even those scant citations to the record are mischaracterized. That is:

1. Landa cites her own testimony at II RR 80 in support of the proposition that she has lived and worked in Iowa for the past five years, except for a short period of time she spent in Travis County trying to reconnect to her son. In fact, Landa actually testified that during the last five years she has spent time living and/or working in Texas, Iowa, Michigan, and New York, including eight months or so that she again resided in Texas. II RR 37-42.

2. Landa's other record citation is to her testimony and exhibits (II RR 62-63; III RR 207-271, Defendant's Exhs.1-4) regarding her filing state income tax returns in Iowa. Of course, whether or not Landa filed state income tax returns in a state other than Texas (or 2 states, or 10 states, or 20 states other than Texas) demonstrates little to nothing with respect to the contacts she has or doesn't have with Texas.

Landa's only other record citation with respect to this point of error is again to Plaintiff's First Amended Original Petition, at CR 16, where she quotes that pleading (correctly) as stating, "The Court has jurisdiction over Defendant as a result of her continuous and systematic contacts, both personal and professional, with Austin, Travis County, Texas, for well over twenty (20) years, up to and including the time this suit was filed." Appellant's Brief at 18. About this quote Landa says in her brief, "This is not a true statement," and supports her assertion with only the above-referenced citations. When questioned on cross-examination at the hearing on her special appearance Landa said the following:

> Q: Now, Ms. Landa, you lived and worked in Austin, Texas, for the better part of the last 20 years. Correct?
>
> A: Yes, sir.

--II RR 79-80.

Once again, the remainder of Landa's discussion on this point of error is limited to a discussion of various authorities she believes apply to the instant case on the basis of conclusory statements of "fact" regarding her ongoing and systematic contacts with Texas (or lack thereof), without citations to support for same in the record. In short, as with her second point of error, the foregoing demonstrates that Landa has waived any purported error related to her third point of error, as she has inadequately briefed same.

Assuming *arguendo* that Landa has not waived this point of error as discussed above, her challenge on this point still fails. "If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts. *Moki Mac*, 221 S.W.3d at 575, citing *BMC Software*, 83 S.W.3d at 795-96; *CSR Ltd.*, 925 S.W.2d at 595.

The following evidence adduced at the hearing on Landa's Special Appearance supports the trial court's finding that it has general jurisdiction over Landa:

1. While Landa admitted that she had lived and worked in Austin for the better part of the last twenty years on cross-examination, she went even further back on direct examination, acknowledging that she had lived and worked in Austin at least as far back as the mid '80s. II RR 33-35.

[36]

2. Landa testified that she obtained an insurance license from the Texas Department of Insurance in 1986 or 1987, and that she continues to hold an active Texas insurance license to the present.  II RR 34-35 & 80-81.

3. Landa testified that as recently as 2013 & 2014 she was doing business in Austin as Karen Landa Insurance, was a member or sponsor of the Westlake Hills Chamber of Commerce, and even worked on getting insurance quotes for Farris as part of her business during that time.  II RR 81-83.

4. Landa testified that even during parts of 2010 when she was not residing in Texas, she maintained personal property in storage in Texas, spending upwards of $1,500.00 a month in Texas to do so.  II RR 39-41.

5. Landa testified that during her many years in living and working in Austin she worked with a number of nonprofit groups, including serving on the Board of Directors of the Austin Hospice Community Foundation, and acting as a Docent for the Texas Governor's Mansion.  II RR 83-84.

6. Landa testified that she is the beneficiary of a marital trust located in Texas, with Frost Bank as its trustee, pursuant to a late husband's will.  II RR 84-85.

Once again, the record is replete with evidence that demonstrates Landa's long-running, continuous, and systematic contacts with Texas.  Thus, there is sufficient evidence from which the trial court could reasonably have found it has general jurisdiction over Landa. As is set forth at length above, whether Landa challenges the trial court's finding of general jurisdiction under a legal sufficiency analysis, a factual sufficiency analysis, or both, her challenge fails.  A complete review of the record demonstrates more than a scintilla of evidence in favor of the trial court's finding in this regard, and moreover, that such a finding is not against the great weight and preponderance of the evidence.  Thus, the trial court did not commit error in this regard.

[37]

# CONCLUSION

As the foregoing demonstrates, if 'purposeful availment' be the test, then there is little doubt that Landa purposefully availed herself of the benefits, privileges, and obligations of doing business in Texas with a Texas resident. Landa's contacts with Farris in Texas – be they in person, by phone, by text, by e-mail, and/or by regular mail – were anything but random, isolated, or fortuitous. Landa made those contacts, and cultivated those contacts, for the purpose of creating a relationship with Farris whereby he would loan her significant funds for the purchase of a home. Certainly, Farris took no unilateral actions to create said relationship or the contacts that Landa made with the forum. The benefit to Landa was clear, and ultimately, equally so the detriment to Farris.

Moreover, this is not the rare case in which the exercise of personal jurisdiction does not comport with fair play and substantial justice once the nonresident defendant has purposefully availed herself of the privilege of conducting business in the forum. In fact, Landa has never asserted, either in her Special Appearance, or at the hearing thereon, that being haled into Texas to respond to the underlying lawsuit would cause any undue burden on her. In sum, the trial court was correct in finding that it has personal jurisdiction over Landa with respect to this matter, and there is no reason, compelling or otherwise, to disturb the trial court's finding in this respect.

**PRAYER**

Appellee requests that the Court of Appeals reject the issues raised by Appellant on appeal and affirm the trial court's Order Denying Special Appearance of Defendant, Karen E. Landa, as; (i) Appellant's first point of error was waived for failure to properly preserve same; (ii) Appellant's first point of error fails as Farris's jurisdictional allegations were sufficient to shift the burden to Landa to negate all bases for personal jurisdiction; (iii) Appellant's second point of error was waived for failure to adequately brief same; (iv) Appellant's second point of error fails as the record demonstrates both factually sufficient and legally sufficient bases for the trial court's finding of specific jurisdiction; (v) Appellant's third point of error was waived for failure to adequately brief same; and, (vi) Appellant's third point of error fails as the record demonstrates both factually sufficient and legally sufficient bases for the trial court's finding of general jurisdiction. Thus, Appellant has failed to demonstrate any reversible error by the trial court in denying Landa's Special Appearance. Appellee further requests such other and further relief to which he may show himself justly entitled.

[39]

Respectfully submitted,

/s/ Guillermo Ochoa-Cronfel
Guillermo Ochoa-Cronfel
Texas Bar No. 15175600
The Cronfel Firm
2700 Bee Caves Road, Suite 103
Austin, Texas 78746
Telephone:  (512) 347-9600
Facsimile:  (512) 347-9911
Guillermo@thecronfelfirm.com

**Counsel for Appellee,
Charles L. Farris**

[40]

## Certificate of Compliance

I certify that on November 10, 2015, this Appellee's Brief was produced on a computer and contains 7,869 words, excluding the caption, statement regarding oral argument, table of contents, index of authorities, statement of the case, and statement of the issues presented, and thus does not exceed the 15,000 word limit provided for by Tex. R. App. P. 9.4(i).

/s/ Guillermo Ochoa-Cronfel
Guillermo Ochoa-Cronfel


## Certificate of Filing and Service

I certify that on November 10, 2015, I used the Court's electronic case filing system to file this Appellee's Brief and to serve this document on the counsel for Appellant:

Mr. Terry L. Scarborough
Texas Bar No. 17716000
Ms. V. Blayre Pena
Texas Bar No. 24050372
Hance Scarborough, LLP
400 W. 15th Street, Suite 950
Austin, Texas 78701
Telephone: (512) 479-8888
Facsimile: (512) 482-6891
tscarborough@hslawmail.com
bpena@hslawmail.com

/s/ Guillermo Ochoa-Cronfel
Guillermo Ochoa-Cronfel

# **APPENDIX**

**Tab**

1) Special Appearance of Defendant, Karen E. Landa dated December 22, 2014 (CR 9-12).

2) Plaintiff's First Amended Original Petition dated June 24, 2015 (CR 15-22).

3) Plaintiff's Response to Defendant's Special Appearance dated July 1, 2015 (CR 23-30).

4) Tex. Civ. Prac. & Rem. Code §17.042.

5) Tex. R. App. P. 38.1(h)

6) Hearing Testimony of Karen E. Landa (II RR 32-94).

7) Hearing Testimony of Charles L. Farris (II RR 94-130).

8) Plaintiff's Hearing Exhibit #1 (III RR 6-8).

9) Plaintiff's Hearing Exhibit #6 (III RR 18-19).

10) Plaintiff's Hearing Exhibit #7 (III RR 20-24).

11) Plaintiff's Hearing Exhibit #9 (III RR 205-206).

CAUSE NO. D-1-GN-14-004669

| | | |
|---|---|---|
| CHARLES L. FARRIS | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| KAREN E. LANDA, | § | |
| | § | |
| Defendant. | § | 98TH JUDICIAL DISTRICT |

## SPECIAL APPEARANCE OF DEFENDANT KAREN E. LANDA

Defendant, Karen E. Landa, in the above cause, makes this Special Appearance, pursuant to Rule 120a of the Texas Rules of Civil Procedure, for the purpose of objecting to the jurisdiction of the Court over Defendant Karen E. Landa, and as grounds will show the Court the following.

## SPECIAL APPEARANCE

1. This special appearance is made as to the entire proceeding and is made before any motion to transfer or any other plea, pleading, or motion filed by Defendant.

2. This court does not have jurisdiction over Defendant because Defendant is not amenable to process issued by the courts of Texas because:

    a. Defendant is not a resident of Texas and is not required to maintain and does not maintain a registered agent for service in Texas.

    b. Defendant does not now engage and has not engaged in business in Texas or committed any tort, in whole or in part, within the state.

    c. Defendant does not maintain a place of business in Texas and has no employees, servants, or agents within the state.

    d. Defendant has no substantial connection with Texas arising from any action or conduct of Defendant purposefully directed toward Texas.

9

e. Plaintiff's claims do not arise from and are not related to any activity conducted by Defendant in Texas.

f. Defendant has no continuing and systematic contacts with Texas.

3. The assumption of jurisdiction by the court over Defendant would offend traditional notions of fair play and substantial justice, depriving Defendant of due process as guaranteed by the Constitution of the United States.

## PRAYER

For these reasons, Defendant requests that the court set this motion for hearing on notice to Plaintiff, and that after hearing, the court grant this motion and dismiss the entire proceeding as to Defendant for want of jurisdiction.

Respectfully submitted,

HANCE SCARBOROUGH, LLP
450 W 15th Street, Suite 950
Austin, Texas 78701
Telephone: 512.479.8888
Facsimile: 512.482.6891

By: _____
Terry L. Scarborough
State Bar No. 17716000
tscaroborough@hslawmail.com
V. Blayre Peña
State Bar No. 24050372
bpena@hslawmail.com

10

## VERIFICATION

STATE OF IOWA                              §
                                           §
COUNTY OF _Dallas_                          §
                                           §

BEFORE ME, the undersigned authority, on this day appeared Karen E. Landa, who, being first duly sworn, stated under oath that she is the Defendant in this case. She has read the above and foregoing Special Appearance and that the factual statements contained in paragraph 2 are within her personal knowledge and true and correct.

_____
Karen E. Landa

SUBSCRIBED AND SWORN TO BEFORE ME on this __20th__ day of December, 2014.

NOTARIAL SEAL
IOWA
AMANDA SHORT
COMMISSION NUMBER 753933
MY COMMISSION EXPIRES
_7/28/2017_

_____
Notary Public in and for
The State of Iowa

11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel and parties of record as set forth below on this the 22nd day of December, 2014, to wit:

**VIA FACSIMILE**
Guillermo Ochoa-cronfel
THE CRONFEL FIRM
2700 Bee Cave road, Suite 103
Austin, Texas 78746
512-347-9600
512-347-9911 fax

Terry L. Scarborough

CAUSE NO. D-1-GN-14-004669

| | | |
|---|---|---|
| CHARLES L. FARRIS, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| KAREN E. LANDA, | § | |
| *Defendant* | § | 98th JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, CHARLES L. FARRIS, (hereinafter referred to as "Plaintiff" or "Farris") complaining of KAREN E. LANDA, (hereinafter referred to as "Defendant" or "Landa") and files his, First Amended Original Petition in this matter, and for causes of action respectfully shows the Court as follows:

## I.
## PARTIES

1.     Plaintiff is a resident of Austin, Travis County, Texas.

2.     Defendant, is a resident of the State of Iowa who has resided in Austin, Travis County, Texas, and has conducted business with Plaintiff in Austin, Travis County, Texas. Defendant has already been served in accordance with Tex. R. Civ. P. 108.

## II.
## DISCOVERY LEVEL

3.     Plaintiff intends to conduct discovery under Level III of the discovery control plan, pursuant to Texas Rule of Civil Procedure 190.4.

## III.
## JURISDICTION/VENUE

4.     The Court has jurisdiction over Defendant, pursuant to Tex. Civ. Prac. & Rem. Code 17.041,

15

et. seq., because Defendant conducted business with Plaintiff in Austin, Travis County, Texas. Plaintiff and Defendant entered into an agreement whereby Plaintiff would loan Defendant money towards the purchase of a house, and Plaintiff was to perform his obligations under the agreement between Plaintiff and Defendant, in whole or in part in this state. Moreover, the Court has jurisdiction over Defendant as a result of her continuous and systematic contacts, both personal and professional, with Austin, Travis County, Texas, for well over twenty (20) years, up to and including the time this suit was filed.

5. The Court has jurisdiction over the controversy because the damages are within the jurisdictional limits of the Court. Plaintiff seeks monetary relief over $100,000 but not more than $200,000, as well as costs of court and expenses, pre-judgment and post-judgment interest, and attorney's fees.

6. Travis County is a proper venue for this action under §15.002 of the Tex. Civ. Prac. § Rem. Code, as a substantial part of the events or omissions giving rise to the claim occurred in Travis County, Texas.

## IV.
## FACTS

7. Beginning in the summer of 2010 and going through (at least) February of 2011, Plaintiff made numerous loans to Defendant. The total amount of money loaned by Plaintiff to Defendant in these transactions, and currently remaining un-repaid, is at least $95,434.86.

8. In December, 2010, Plaintiff and Defendant met for a weekend in Dallas, Texas. During that time, Plaintiff and Defendant discussed trying to find a house in Iowa to purchase. The parties reached an agreement whereby Plaintiff would make the required down payment on the house, as a

[2]

16

loan to Defendant, that Defendant would repay said loan, and that both parties' names would be on the deed to the house.

9.  In February, 2011, Plaintiff loaned Defendant approximately $90,000.00, by wiring said monies from his bank in Austin to a joint account the parties held at a financial institution in Iowa, which was to be used in the purchase of real property (a home) located at 7685 Escalade Court, West Des Moines, Dallas County, Iowa 50266 (the "Property"). This loan was the culmination of the above-referenced agreement between Plaintiff and Defendant that had taken place in December, 2010, in which Defendant sought out and requested the loan from Plaintiff specifically for the purpose of purchasing the Property. The agreement between the parties on this matter contemplated Plaintiff liquidating a CD which he had on deposit with his financial institution in Austin, in order to obtain the funds to loan Defendant (the "Loan Funds"), and then sending the Loan Funds from his financial institution in Austin, both actions which Plaintiff undertook in Austin.

10.  The above-referenced arrangement between Plaintiff and Defendant also required Plaintiff to engage in correspondence amongst Plaintiff, Defendant, and the financial institution in Iowa, regarding the larger mortgage loan towards the purchase of the Property. This correspondence included Plaintiff forwarding financial information and documentation from Austin to the Iowa financial institution, ostensibly as a "co-borrower" on the mortgage loan related to the Property.

11.  The Loan Funds, once forwarded from Plaintiff, in Austin, to a **joint** account of Plaintiff and Defendant at a financial institution in Iowa, were to serve as the **entire** amount of cash required at closing on the Property from the "borrower" in satisfaction of the mortgage agreement.

12.  As part of the inducement for the above-referenced loan, and as alluded to above, Defendant represented to Plaintiff that he would be included as a grantee on the warranty deed related to the

[3]

17

Property, as joint tenant with full rights of survivorship. In this way, Plaintiff would have some interest in the Property to serve essentially as security for the loan. Defendant further represented to Plaintiff that she would pay back the loan.

13.     Moreover, Plaintiff relied on Defendant's long-standing, continuous, and systematic contacts with Austin, Travis County, Texas, in agreeing to the above-referenced loan; (i) Defendant lived in Austin for the better part of over the last twenty-plus (20+) years, up to and including 2014; (ii) Plaintiff and Defendant were married and resided together in Austin for approximately seven (7) years; (iii) Defendant maintained an active insurance license with the Texas Department of Insurance from April, 1987 through April, 2015, and in fact did business as an insurance agent for many of those years in Austin and neighboring areas, including operating her own insurance agency, Karen Landa Insurance, as recently as 2014; (iv) Defendant was registered with the Texas Securities Board as an Investment Adviser Representative from 2005-2008, working with multiple financial services companies in Austin; (v) Defendant owned and/or operated Tribeza Magazine in Austin, Travis County, Texas, in 2009-2010; and, (vi) over the course of her many years of residence and professional life in Austin, Defendant contributed to and/or volunteered with a number of non-profit groups in Austin, including, but not limited to Hospice Austin Fund and the Texas Governor's Mansion.

14.     Notwithstanding the agreement between the parties and her representations to Plaintiff (and unbeknownst to Plaintiff at the time), once Plaintiff forwarded the Loan Funds from Austin to Iowa, Defendant unilaterally removed Plaintiff from involvement in the mortgage loan, and then unilaterally struck Plaintiff's name from the warranty deed when it was executed, and same was filed of record in the real property records of Dallas County, Iowa, with Plaintiff's name crossed out as a

[4]

grantee.

15. Over the next three years, Plaintiff made numerous efforts to engage Defendant on these matters, seeking to arrange for payment plans, or make some other kind of arrangements with Defendant to address the outstanding amounts due, to little avail. Defendant came to Austin in May, 2012, and made a payment in the amount of $15,000.00 to Plaintiff, but no additional payments were forthcoming.

16. On August 23, 2014, Plaintiff made written demand for payment of the above-referenced debts on Defendant. Despite having received same, Defendant continues to make no efforts to repay the amounts due or to make arrangements for the repayment of same.

## V.
## First Cause of Action (Breach of Contract)

17. Paragraphs 1 through 16, above, are incorporated herein by reference.

18. Defendant's above-described actions constitute Breaches of Contract with respect to the loans made by Plaintiff to Defendant.

## VI.
## Second Cause of Action (Fraud and/or Fraud in the Inducement)

19. Paragraphs 1 through 16, above, are incorporated herein by reference.

20. Defendant's above-described actions support Plaintiff's claim for Fraud and/or Fraud in the Inducement with respect to, at least, the approximately $90,000 that Plaintiff loaned Defendant specifically for the purpose of purchasing the Property.

## VII.
## Third Cause of Action (Quantum Meruit)

21. Paragraphs 1 through 16, above, are incorporated herein by reference.

[5]

19

22.     Alternatively, Defendant's above-described actions also support Plaintiff's Quantum Meruit claim as Plaintiff provided loans to Defendant, Defendant accepted the benefit of said loans, and Defendant had reasonable notice that Plaintiff expected that those loans would be repaid.

## VIII.
### Exemplary Damages

23.     Paragraphs 1 through 20, above, are incorporated herein by reference.

24.     Plaintiff intends to seek exemplary damages against Defendant, with respect to his cause of action for Fraud and/or Fraud in the Inducement.

## IX.
### REMEDIES SOUGHT

25.     The damages sought by the Plaintiff in this cause are within the jurisdictional limits of the court.

26.     Plaintiff seeks actual damages and exemplary damages totaling over $100,000 but not more than $200,000, as well as costs of court and expenses, pre-judgment and post-judgment interest, and attorney's fees.

## X.
### Attorney's Fees

27.     Paragraphs 1 through 26, above, are incorporated herein by reference.

28.     Plaintiff is entitled to his attorney's fees incurred in pursuit of this cause pursuant to (at least) Tex. Civ. Prac. & Rem. Code §38.001, et. seq.

## XI.
### CONDITIONS PRECEDENT

29.     All conditions precedent to bringing this suit and the relief sought herein have occurred or have been taken.

[6]

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited in the manner and for the length of time required by law to appear and answer this Petition, and that upon final hearing, Plaintiff have Judgment for; (i) Actual Damages and/or Exemplary Damages against Defendant as set forth above; (ii) interest on any monetary damages awarded, from the date of judgment at the legal rate; (iii) reasonable attorney's fees and costs of court; (iv) reasonable attorney's fees in the event of appeal; and/or, for such other and further relief both general and special, at law and in equity, to which Plaintiff may show himself justly entitled. Nothing herein is intended as an election of remedies available to Plaintiff under law.

Respectfully submitted,

Guillermo Ochoa-Cronfel
THE CRONFEL FIRM
2700 Bee Cave Road, Suite 103
Austin, Texas 78746
Telephone: 512-347-9600
Facsimile: 512-347-9911
Guillermo@thecronfelfirm.com

By:/s/ Guillermo Ochoa-Cronfel
    Guillermo Ochoa-Cronfel
    State Bar No. 15175600
    ATTORNEY FOR PLAINTIFF

[7]

21

**CERTIFICATE OF SERVICE**

I, Guillermo Ochoa-Cronfel, certify by my foregoing signature that a true and correct copy of the foregoing has been served via the method indicated below, pursuant to the Texas Rules of Civil Procedure to the person(s) noted below on this the 24th day of June, 2015.

Terry L. Scarborough          Via Texas eFiling
V. Blayre Peña            & E-mail: tscarborough@hslawmail.com
Hance Scarborough, LLP     bpena@hslawmail.com
450 W. 15th St., Ste. 950
Austin, Texas 78701
T: 512-479-8888
T: 512-482-6891
ATTORNEYS FOR DEFENDANT

[8]

CAUSE NO. D-1-GN-14-004669

| | | |
|---|---|---|
| CHARLES L. FARRIS, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| KAREN E. LANDA, | § | |
| Defendant | § | 98th JUDICIAL DISTRICT |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S SPECIAL APPEARANCE**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, CHARLES L. FARRIS, (hereinafter referred to as "Plaintiff" or "Farris") and files his, Response to Defendant's Special Appearance, and respectfully shows the Court as follows:

**I.**

"The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002), citing *McKanna v. Edgar*, 388 S.W.2d 927, 930 (Tex. 1965). Plaintiff's Original Petition, as well as his live pleading, Plaintiff's First Amended Petition, set forth in detail (amongst other things) allegations that; (i) Defendant entered into an agreement with Plaintiff, in Texas, whereby Plaintiff would loan Defendant funds for the purchase of a house, Defendant would pay Plaintiff back for said loan, and Plaintiff's name would be on the deed for said house; (ii) Plaintiff's performance under the agreement would take place, in whole, within Texas; (iii) Defendant breached the terms of that agreement; (iv) Defendant defrauded Plaintiff by unilaterally striking his name from the Warranty Deed on her purchase of the above-referenced house; and, (v) along with the above-referenced specific contacts Defendant has with Texas related

[1]

23

to Plaintiff's claims in this case, Defendant has and has had long-standing, systematic and continuous contacts with Texas. Plaintiff has carried his initial burden with respect to his jurisdictional allegations.

## II.

As the plaintiff has carried his burden with respect to the jurisdictional allegations, the burden now falls on the defendant challenging this Texas court's personal jurisdiction over her to negate all jurisdictional bases. *BMC Software*, 83 S.W.3d at 793, citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985). Defendant's bare-bones pleading, containing only conclusory statements (many of which are demonstrably false), attested to via verification, is insufficient to accomplish this task. See, Tex. R. Civ. P. 120a(3); *Small v. Small*, 216 S.W.3d 872, 876-877 (Tex.App.-Beaumont 2007, pet. denied).

"A Texas court may exercise jurisdiction over a nonresident if two conditions are met. First, the Texas long-arm statute must authorize the exercise of jurisdiction. Second, the exercise of jurisdiction must be consistent with federal and state constitutional guarantees of due process." *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990), citing Tex. Civ. Prac. & Rem. Code §§s 17.041 – 17.069.

The Texas long arm-statute states in pertinent part, "In addition to other acts that may constitute doing business, a nonresident does business in this if the nonresident: (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole or in part in this state…" Tex. Civ. Prac. & Rem. Code §17.042. And importantly, "…section 17.042's broad language extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *BMC*

[2]

24

*Software,* 83 S.W.3d at 795, citing *U-Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex. 1977).

"Personal jurisdiction over nonresident defendants is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice." *BMC Software,* 83 S.W.3d at 795, citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); see also, *Small,* 216 S.W.3d at 876-877, and *Citrin Holdings, L.L.C. v. Minnis,* 305 S.W.3d 269, 278-279 (Tex.App.-Houston [14th Dist.] 2009, no pet.).

Further, "Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction." *BMC Software,* 83 S.W.3d at 795, citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413-14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), and *Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex. 1991). Moreover, "To determine whether a nonresident defendant has sufficient minimum contacts with Texas to support the exercise of personal jurisdiction," turns on, "…whether the nonresident defendant 'purposefully availed' itself of the privilege of conducting business in Texas." *Citrin Holdings,* 305 S.W.3d at 278, citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), and *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex. 2005). In the 'purposeful availment' analysis the court considers; (i) the defendant's actions; (ii) whether the defendant's actions were purposeful, as opposed to random, isolated, or fortuitous; (iii) whether the defendant sought some benefit, advantage, or profit by availing itself of the privilege of doing business in Texas. *Citrin Holdings,* 305 S.W.3d at 278-279, citing *Michiana,* 168 S.W.3d at 785. And, lest we forget, "A defendant may purposefully avoid Texas by structuring its transactions to neither profit from Texas's laws nor

[3]

subject itself to personal jurisdiction." *Id*. at 279, citing *Burger King*, 471 U.S. at 472, 105 S.Ct. 2174, and *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007).

Finally, "Only in rare cases will the exercise of personal jurisdiction not comport with fair play and substantial justice when a nonresident defendant has purposefully availed itself of the privilege of conducting business within a forum." *Citrin Holdings*, 305 S.W.3d at 280, citing *Guardian Royal*, 815 S.W.2d at 231.

**III.**

*Specific Jurisdiction:* "Specific jurisdiction over a nonresident defendant is established if (1) the defendant's activities were purposefully directed to the forum state; and, (2) there is a substantial connection between the defendant's forum contacts and the operative facts of the litigation. *Citrin Holdings*, 305 S.W.3d at 279, citing *Moki Mac*, 221 S.W.3d at 585. Essentially, jurisdiction is proper if the cause of action arises from some act or acts which constitute "doing business" in Texas, as defined in the Texas long-arm statute. *Schlobohm*, 784 S.W.2d at 356-357.

Here, as was the case in *Citrin Holdings*, Defendant reached an agreement with Plaintiff regarding the transfer of money at issue, through prolonged discussions with Plaintiff. Defendant communicated face-to-face with Plaintiff in Texas, and via telephone, e-mail, and mail, regarding the contemplated transaction, which was performed by Plaintiff in whole in Texas, and by Defendant (at the very least, in part) in Texas. With respect to the specific jurisdiction analysis, the *Citrin* Court said, "These circumstances demonstrate Citrin's purposeful contact with Texas along with an intent to obtain benefits from those contacts, and they defeat any suggestion that Citrin's business-related presence in Texas was merely 'random, isolated or fortuitous.' *Michiana*, 168 S.W.3d at 785; see also *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 879 (Tex.App.-Austin 2008, no pet.)." *Citrin Holdings*,

[4]

305 S.W.3d at 283. "The evidence of Texas-based contractual performance in this case reinforces the exercise of specific jurisdiction." *Citrin Holdings*, 305 S.W.3d at 283, citing Texas Civ. Prac. & Rem. Code §17.042(1); *Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 283 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *Fleischer v. Coffey*, 270 S.W.3d 334, 338 (Tex.App.-Dallas 2008, no pet.).

General Jurisdiction: In a general jurisdiction analysis, the plaintiff's cause(s) of action need not arise from or relate to the nonresident defendant's contacts with the forum, but the court's jurisdiction over the defendant must be grounded in the defendant's contacts of a continuous and systematic nature with the forum. *Citrin Holdings*, 305 S.W.3d at 279, citing *Helicopteros*, 466 U.S. at 414-416, 104 S.Ct. 1868, and *Guardian Royal*, 815 S.W.2d at 228. This is a more demanding minimum contacts analysis than that required for specific jurisdiction, in which the court examines the defendant's contacts and forum-related activities up to the time suit was filed. *Citrin Holdings*, 305 S.W.3d at 279, citing *Guardian Royal*, 815 S.W.2d at 228, and *PHC-Minden, L.P. v. Kimberley-Clark Corp.*, 235 S.W.3d 163, 170 (Tex. 2007).

In the instant case, the general jurisdiction inquiry by the Court should focus on Defendant's long-standing, continuous and systematic contacts with Texas, which Plaintiff will show include; (i) Defendant having lived and worked in Austin for a majority of the last twenty-plus (20+) years; (ii) Defendant having lived and worked in Austin as recently as April, 2014; and, (iii) Defendant holding an active license with the Texas Department of Insurance from April, 1987, to the present. Plaintiff will show that not only should specific jurisdiction apply in this case, but general jurisdiction should apply as well.

[5]

**IV.**

Amongst Defendant's attempts to negate the court's jurisdictional bases in this matter is her sworn statement that, "Defendant does not now engage and has not engaged in business in Texas or committed any tort, in whole or in part, within the state." *Defendant's Special Appearance, ¶ 2(b).* Plaintiff's testimony at the hearing on Defendant's Special Appearance will mirror the allegations in his pleadings in this respect; chiefly, that he and Defendant entered into a loan agreement (in Texas) whereby he would loan Plaintiff the funds at issue herein, and further, perform his obligations under said agreement in whole or in part in Texas. Moreover, Defendant's 1st Amended Responses to Plaintiff's 1st Set of Discovery Requests also demonstrate the falsity of Defendant's above-described statement. For example, in response to Requests for Admission Nos. 13 – 17, Defendant admits that; (i) Karen Landa Insurance is a d/b/a of Defendant; (ii) as recently as 2014, Karen Landa Insurance was a member of and/or sponsor of the Westlake Hills Chamber of Commerce; (iii) from (at least) January, 2010 through March 13, 2015, Defendant held an active insurance license with the Texas Department of Insurance[1]; and, (iv) within the last ten (10) years, Defendant served on the Board of Directors of Austin Hospice Community Foundation. *See First Amended Responses to First Set of Discovery Requests to Defendant Karen E. Landa, attached hereto and incorporated herein as Exhibit "A".* By Defendant's own admission, and the testimony of Plaintiff, Plaintiff will demonstrate that Defendant has engaged in business in the State of Texas, including the business at issue in this matter.

Likewise, Defendant's sworn, conclusory statements that; "Defendant has no substantial connection with Texas arising from any action or conduct of Defendant purposefully directed toward

[6]

Texas," "Plaintiff's claims do not arise from and are not related to any activity conducted by Defendant in Texas," and "Defendant has no continuing and systematic contacts with Texas," are demonstrably false. Along with those discovery responses noted above, in response to Requests for Admission Nos. 1, 2 & 8, in the above-referenced Exhibit A, Defendant admits that Plaintiff wired over $89,000.00 in funds, which are specifically complained of in Plaintiff's First Amended Petition as being the subject of a loan agreement between Plaintiff and Defendant, to a joint account of Plaintiff and Defendant, and that said funds were used by Defendant to purchase a house in Iowa. *See Exhibit A*. Defendant specifically sought the funds from Plaintiff, a Texas resident, in Texas. Again, Plaintiff will also demonstrate, that Defendant sought out and obtained the agreement (and the funds arising from same), voluntarily, from a Texas resident, knowing full well that the funds would come from a Texas resident.

As is set forth above and as Plaintiff will further show at the hearing on Defendant's Special Appearance, Plaintiff's allegations in this case amply demonstrate the applicability of the Texas long arm-statute in this case, that federal due process concerns are met in this case, and that this Court has personal jurisdiction over Defendant.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Court deny Defendant's Special Appearance, that Defendant be required to appear and answer his First Amended Original Petition, and for such other and further relief both general and special, at law and in equity, to which Plaintiff may show himself justly entitled. Nothing herein is intended as an election of remedies available to Plaintiff under law.

---

[1] In fact, Defendant testified at deposition that she **still** holds an active insurance license with TDI.

[7]

Respectfully submitted,

Guillermo Ochoa-Cronfel
THE CRONFEL FIRM
2700 Bee Cave Road, Suite 103
Austin, Texas 78746
Telephone: 512-347-9600
Facsimile: 512-347-9911
Guillermo@thecronfelfirm.com

By:/s/ Guillermo Ochoa-Cronfel
 Guillermo Ochoa-Cronfel
 State Bar No. 15175600
 ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I, Guillermo Ochoa-Cronfel, certify by my foregoing signature that a true and correct copy of the foregoing has been served via the method indicated below, pursuant to the Texas Rules of Civil Procedure to the person(s) noted below on this the 1st day of July, 2015.

Terry L. Scarborough      Via E-mail: tscarborough@hslawmail.com
V. Blayre Peña         bpena@hslawmail.com
Hance Scarborough, LLP
450 W. 15th St., Ste. 950
Austin, Texas 78701
T: 512-479-8888
T: 512-482-6891
ATTORNEYS FOR DEFENDANT

[8]

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 2. Trial, Judgment, and Appeal
      Subtitle B. Trial Matters
        Chapter 17. Parties; Citation; Long-Arm Jurisdiction (Refs & Annos)
          Subchapter C. Long-Arm Jurisdiction in Suit on Business Transaction or Tort (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 17.042

§ 17.042. Acts Constituting Business in This State

Currentness

In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2) commits a tort in whole or in part in this state; or

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

**Credits**
Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

Notes of Decisions (1526)

V. T. C. A., Civil Practice & Remedies Code § 17.042, TX CIV PRAC & REM § 17.042
Current through the end of the 2015 Regular Session of the 84th Legislature

End of Document
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Appellate Procedure
    Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos)
      Rule 38. Requisites of Briefs (Refs & Annos)

TX Rules App.Proc., Rule 38.1

38.1. Appellant's Brief

Currentness

The appellant's brief must, under appropriate headings and in the order here indicated, contain the following:

(a) *Identity of Parties and Counsel.* The brief must give a complete list of all parties to the trial court's judgment or order appealed from, and the names and addresses of all trial and appellate counsel, except as otherwise provided in Rule 9.8.

(b) *Table of Contents.* The brief must have a table of contents with references to the pages of the brief. The table of contents must indicate the subject matter of each issue or point, or group of issues or points.

(c) *Index of Authorities.* The brief must have an index of authorities arranged alphabetically and indicating the pages of the brief where the authorities are cited.

(d) *Statement of the Case.* The brief must state concisely the nature of the case (e.g., whether it is a suit for damages, on a note, or involving a murder prosecution), the course of proceedings, and the trial court's disposition of the case. The statement should be supported by record references, should seldom exceed one-half page, and should not discuss the facts.

(e) *Any Statement Regarding Oral Argument.* The brief may include a statement explaining why oral argument should or should not be permitted. Any such statement must not exceed one page and should address how the court's decisional process would, or would not, be aided by oral argument. As required by Rule 39.7, any party requesting oral argument must note that request on the front cover of the party's brief.

(f) *Issues Presented.* The brief must state concisely all issues or points presented for review. The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.

(g) *Statement of Facts.* The brief must state concisely and without argument the facts pertinent to the issues or points presented. In a civil case, the court will accept as true the facts stated unless another party contradicts them. The statement must be supported by record references.

(h) *Summary of the Argument.* The brief must contain a succinct, clear, and accurate statement of the arguments made in the body of the brief. This summary must not merely repeat the issues or points presented for review.

(i) *Argument.* The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.

(j) *Prayer.* The brief must contain a short conclusion that clearly states the nature of the relief sought.

(k) *Appendix in Civil Cases.*

(1) Necessary Contents. Unless voluminous or impracticable, the appendix must contain a copy of:

(A) the trial court's judgment or other appealable order from which relief is sought;

(B) the jury charge and verdict, if any, or the trial court's findings of fact and conclusions of law, if any; and

(C) the text of any rule, regulation, ordinance, statute, constitutional provision, or other law (excluding case law) on which the argument is based, and the text of any contract or other document that is central to the argument.

(2) Optional Contents. The appendix may contain any other item pertinent to the issues or points presented for review, including copies or excerpts of relevant court opinions, laws, documents on which the suit was based, pleadings, excerpts from the reporter's record, and similar material. Items should not be included in the appendix to attempt to avoid the page limits for the brief.

**Credits**
Eff. Sept. 1, 1997. Amended by Supreme Court March 10, 2008, and Aug. 20, 2008, eff. Sept. 1, 2008. Approved by Court of Criminal Appeals Sept. 30, 2008, eff. Sept. 30, 2008.

Notes of Decisions (937)

Rules App. Proc., Rule 38.1, TX R APP Rule 38.1
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

MR. OCHOA-CRONFEL: Yes, ma'am.

THE COURT: Go ahead.

**KAREN ELIZABETH TAYLOR,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. SCARBOROUGH:

Q. Would you state your name for the record, please?

A. My name is Karen Elizabeth Taylor.

Q. And you are the defendant in this case?

A. Yes, sir.

Q. You're one and the same as Karen Landa Taylor?

A. Yes, sir.

Q. Okay. Very briefly, you graduated from high school in what year?

A. 1978.

Q. Where?

A. Urbandale, Iowa.

Q. And you came to UT to go to college?

A. Yes, sir.

Q. Why?

A. I came to UT because my grandmother lived here in Austin and had started an IT school, and so I was able to live with her and attend UT as a Texas

resident because I was born in Denton, Texas.

Q. And did you graduate?

A. No, sir, I did not.

Q. How many years did you attend UT?

A. Two years.

MR. OCHOA-CRONFEL: Your Honor, I'm sorry. Is the microphone working? I don't think it's working, and I'm having a little bit of trouble hearing.

Excuse me; I didn't mean to --

THE COURT: Could you speak a little louder?

THE WITNESS: Okay.

Q. (BY MR. SCARBOROUGH) You need to just speak up.

A. Okay.

Q. Have you ever been in court before?

A. Yes, I have.

Q. Related to a divorce or something?

A. It was my husband's estate.

Q. Okay. We'll touch on that very briefly. The Court has said she didn't want to hear too much about it --

A. Okay.

Q. -- but I, in my opening statement, talked

about a period of time from 1980 --

A. Yes, sir.

Q. -- through -- I think what I said, Judge, was the summer of 2010. So during that period of time, that's 30 years, did you either live in Williamson or Travis County?

A. Yes, sir.

Q. And did you work in Williamson or Travis County?

A. Yes, sir.

Q. And did you -- were you married in either Williamson or Travis County?

A. Yes, sir.

Q. On more than one occasion?

A. Yes, sir.

Q. You had -- divorced in Williamson or Travis County during that 30 years.

A. Yes, sir.

Q. And you had children during that 30 years in Austin or Williamson County.

A. Yes, sir.

Q. As part of your work, were you ever at any time required to obtain, from the Texas Department of Insurance, a license?

A. Yes, sir.

Q.    When was that?

A.    That would have been 1986 or '87.

Q.    Okay.  And do you still hold that license?

A.    Yes, I do.

Q.    Today?

A.    Yes, sir.

Q.    Okay.  Now, has that license been changed from time to time when you go back and forth to Iowa from a resident license to a nonresident license?

A.    Yes.

Q.    Did you at some point along the way acquire a license in Iowa to be -- to sell insurance products?

A.    Yes, sir.

Q.    Okay.  Can you have a resident license to sell insurance in two different states at the same time?

A.    No, sir.

Q.    Explain that to the Court.

A.    To have your insurance license, they want to know your address, your residence.  And so when you change your address to a state -- out of state address other than Texas, it automatically flags it as a nonresident license.  I was able to obtain an insurance license in Iowa because I'm grandfathered.

I've been an insurance agent for so long. And that license was -- when I applied for it as a resident of Iowa --

Q. And when was that?

A. That would have been April 2011.

Q. Okay. Now, backing up real quickly. What jobs -- just bracket the years where you actually used -- when you got it in '86 or '87 -- what jobs did you use it for over what period of time?

A. From '86, '87 until 1998 I used my insurance license. And then again when I went to work at another employer from 2005 to 2008.

Q. Okay. Now, the job you had before you left town --

A. Uh-huh.

Q. -- after the '08 -- the last job you had in Texas was what?

A. I worked for *Tribeza* magazine.

Q. Now, was the -- who was the owner of that magazine?

A. The owner was my boyfriend, Dale Dewey. He was a co-owner.

Q. And were you paid -- did you live with him and work together at the same time?

A. Yes. Yes, sir, I did.

Q.    And did your work for the *Tribeza* magazine require you to use that insurance license?

A.    No, sir, it did not.

Q.    Why didn't you at that time just give it up?

A.    Because when you're grandfathered and, as long as I've had that license, it's easier just to renew it every year than to let it go because it is such a huge undertaking to get an insurance license.

Q.    Okay.  But is it your testimony that you didn't use it the rest of the time you were in Austin before you left?

A.    Yes, sir.

Q.    Is that correct?

A.    I did not use the license.

Q.    Okay.  And after that last job where you did use it up through '08, starting with *Tribeza* magazine, did you use it again in Texas before you moved in the summer of 2010?

A.    No, sir, I did not.

Q.    Now, very briefly, you've -- we've established by way of opening statement, but when did you actually move to Iowa to be with your mother?

A.    I arrived there the very end of October, first of November.

Q. Of what year?

A. It would have been 2010.

Q. And so when did you leave Austin?

A. I left Austin the end of June, first of July.

Q. Okay. So during the summer of that year, which would have been 2010, were you still with your boyfriend?

A. I was.

Q. And where did y'all go first?

A. We went -- he flew to Austin and drove with me to his parent's home in Michigan.

Q. Okay. Was he wanting to relocate into New York?

A. He wanted to go back to the East Coast. That's where his contacts were and he was from Connecticut. He wanted to re-establish a position in New York City.

Q. And so for some short period of time did you and he live in a guest quarters, guest house of his parents in Michigan?

A. Yes. We traveled during that time and stayed at the guest house that they had in Roscommon, Michigan, a family home.

Q. And after that what -- what month did you

move to New York?

A.     He drove me to New York.  And it would have been September 2010.

Q.     And so you lived with your boyfriend in New York in September and October?

A.     Yes, sir.

Q.     And did that relationship end?

A.     Yes, it end -- it did.  It ended.

Q.     Now, at the same time what was happening with your mother's health?

A.     My mother's health -- she had -- was in Stage 4 cancer and it kept getting worse.  And when I was in New York, I got a phone call that she had been hospitalized again.  And when -- I knew that it wasn't going to work out with Dale.  I could either go back to Austin, but I knew my mother needed me more.  So a girlfriend of mine flew in from Iowa to New York and drove with me in my car and my dogs and we went to Iowa.

Q.     And that was late October 2010?

A.     Yes.  I remember we arrived on Halloween, 10-31 of 2010.

Q.     And did you move in with your mother?

A.     I moved in with my mother.

Q.     Now, during this period of time did you

have belongings stored somewhere?

A.    I did.

Q.    Where were they stored?

A.    They were stored in Austin -- they were stored in Texas.  I think they were -- it was at a PODS facility, somewhere here I believe in Travis County.

Q.    And I don't want the detail but, just generally, what were your belongings that were stored?

A.    I have huge pieces of artwork and lots of furniture.  I had a very large home, and so it was appliances -- but it was over -- it was five full pods of furniture that were stored.

Q.    All right.  And they -- even when you went to New York, did they stay in Austin?

A.    They always stayed in Austin because Dale didn't have an offer on a job until later, so we didn't know where we were going to go.

Q.    Okay.  And then when you got to Iowa and you're living with your mother, did you immediately bring the storage stuff to Iowa, or was that later?

A.    No.  The storage I did not bring it till December.  I was trying to figure out where to put the items --

Q.    Okay.

A.    -- trying to find a place --

Q.    That's all I want to know.  You brought it in December.

A.    Okay.

Q.    And was there a significant cost in storage?

A.    The cost for the five pods was $1,500 or more every month.  And I was trying to cut back on that expense, so I was trying to figure out a way to get them out of storage.

Q.    Now, we're going to talk in greater detail about the closing, but when was the closing on the condo in Iowa?

A.    February 28th of 2011.

Q.    Okay.  And -- now, with the exception -- you -- we'll get to it in a minute, but you later moved back to Texas for a period of time, some eight or nine months.

A.    Yes, sir.

Q.    When was that time frame --

        MR. OCHOA-CRONFEL:  Your Honor, I'm going to object to the leading.

Q.    (BY MR. SCARBOROUGH)  When was that time frame?

MR. OCHOA-CRONFEL: May I have a ruling on the objection?

THE COURT: Sustained.

A. It was after my mother's death and after her estate was resolved, so it would have been -- I came back in end of July, first of August I arrived in Austin. And that was --

Q. (BY MR. SCARBOROUGH) What year?

A. I'm trying to think of years. 2013.

Q. Okay. And you moved back here for what reason?

A. My son had announced that he was getting married, and I wanted to be part of the wedding ceremony. And I was hoping to reconcile with him. And I knew that, for me to have a relationship with him, I needed to be closer to him and thought that being in Austin would be helpful in that.

Q. And when was he married?

A. He was married February 28th of 2014.

Q. Now, back up real quickly, when you got -- you said in the spring you got your real estate -- not real estate -- your insurance license in Iowa.

A. In 2011, April, uh-huh.

Q. Okay. And when you got that license -- we've talked about having two resident licenses.

What did you do with the Texas license and what did you do with the Iowa license?

MR. OCHOA-CRONFEL: Your Honor, I'm going to -- I'm going to object to -- Mr. Scarborough's testifying and leading the witness. I'm going to object to it.

THE COURT: Overruled.

A. You have an obligation to keep your license up to date. And usually you do that when it's on a renewal. And so when I moved to Iowa and obtained the Iowa license for insurance, that automatically flagged Texas that I was in Iowa. And so they notified me that I needed to change the status to a nonresident and updated my Texas license to show my Iowa address.

Q. (BY MR. SCARBOROUGH) Did you do that?

A. Yes.

Q. All right. And your Iowa license was listed as a resident license?

A. Yes.

Q. Okay. Now, you've testified about a period of time you moved back. When you moved back from July of '13 to April of '14, what did you do with your licenses when you moved back?

A. When I came back I didn't have a job. But

when I was offered a job to go in the insurance business --

Q. When was that?

A. I started work there September of 2013. As -- part of my obligation is to notify Texas that I'm in Texas and to change the status because they can't appoint you as an agent if you don't have a resident license.

Q. So did you do that --

A. Yes.

Q. -- at that time?

A. Yes, sir, I did.

Q. Now, simultaneously did you change your Iowa license to a nonresident?

MR. OCHOA-CRONFEL: Objection; leading, Your Honor.

THE COURT: Sustain -- I mean, overruled. Sorry.

A. Yes, sir, I did.

Q. (BY MR. SCARBOROUGH) Okay. And during the time while you were here in Texas, from September when you got your job of '13 through April of '14, did you -- did you attempt to sell insurance-related products to Texas residents while you were here?

A. I tried to open up an agency after my

training, yes.  December 1 is when I opened up my business.

Q.    Okay.

THE COURT:  Of what year?

THE WITNESS:  2013.

THE COURT:  Okay.

Q.    (BY MR. SCARBOROUGH)  And when did that end?

A.    I resigned in -- end of April 2014.

Q.    And did you -- where did you move to?

A.    I went back to Iowa.

Q.    Okay.  And in Iowa did you -- when you went back to Iowa, did you have a job when you went back?

A.    No, I didn't have a job.

Q.    Did you immediately change your license in Texas to nonresident and the one in Iowa to resident?

MR. OCHOA-CRONFEL:  I'm going to object as leading again.  He's putting words in the --

THE COURT:  Sustained.

MR. OCHOA-CRONFEL:  -- in the witness' mouth.

Q.    (BY MR. SCARBOROUGH)  When did you change, if you did, your licenses in Texas and Iowa to reflect that you were in Iowa?

A.  I changed the address once I had a permanent residence, and that was when I went back to work, and that was September 2014.

Q.  Okay.  And in September of 2014, what did you do with regard to your Iowa license and what did you do with regard to your Texas license?

A.  I updated the Iowa license to show me as a residence of Iowa with the same address, and at the same time updated my Texas license to show the updated address as a nonresident status.

Q.  Okay.  When's the first time -- was it before or after you moved to Iowa on Halloween, October of 2010 -- that you and the plaintiff ever talked about him providing any money?

MR. OCHOA-CRONFEL:  Your Honor, I'm going to object.  There's a continuing pattern of Mr. Scarborough putting words in the witness' mouth.  He's continuing to characterize testimony --

THE COURT:  He just asked when did she first talk --

MR. OCHOA-CRONFEL:  But he's characterizing, Your Honor.  Halloween -- we didn't hear anything about Halloween.

THE COURT:  Overruled.

You can answer that.

A.  When I got to Iowa -- I needed to do something with my belongings, and so I talked to Lee --

Q.  (BY MR. SCARBOROUGH)  The question --

A.  -- probably November of 2014 -- or 2000 -- excuse me.  It would have been the day I got there. 2010.

Q.  November of 2014?

A.  November --

Q.  Excuse me.  We both misspoke.

A.  I know.

Q.  Let's go back.  It was -- you're saying it's November of '10 --

A.  Yes, after I got back to Iowa.

Q.  -- is the first time there was ever any discussion?

A.  Yes.  Yes, sir.

Q.  Okay.  Now, let's talk real briefly about the trip to Dallas.  You understand that -- well, let me ask it this way:  By this time frame, December of 2010, how long had you been divorced from the plaintiff?

A.  For a number of years.

Q.  '91?

A.  Since '91 to current.

Q.   So 19 years?

A.   Yeah, 19 years plus.

Q.   Had y'all continued to have a relationship?

A.   He adopted my first child, and we had another child together.  And so even though we've been divorced, we've been in constant contact because of the kids.

Q.   What conversation did you have with the plaintiff about where you would first meet?  Was it Dallas or somewhere else?

A.   It was brought -- I told Lee I was trying to find a place for me to be able to stay while I was in Iowa, and I was surprised at how reasonable the costs were on houses.  I couldn't find a rental house, but I talked to him that I was looking at properties or a place that I could go.  And so that would have been in November of 2010.

But -- would you repeat the question? I'm not sure what I'm -- I was trying to respond.

Q.   I was checking on my time, and I'm not even for sure that it was responsive.  Let me try to move on.  I don't want to take too much time.

Yeah, the question I was asking is, did you have a conversation with Mr. Farris about him coming to Iowa to discuss this?

A.   He wanted to come to Iowa to discuss it.

Q.   What was said?

A.   He said he wanted to fly up to Iowa to see me and we could talk about it there in Iowa.

Q.   Where did he say he wanted to stay?

A.   He wanted to stay with me, but I was staying --

MR. OCHOA-CRONFEL:  I'm going to --

A.   -- with my mom --

MR. OCHOA-CRONFEL:  -- object again to the leading nature of the questions, Your Honor. It -- where did he say he wanted to stay?  I mean, that's --

THE COURT:  Overruled.

MR. OCHOA-CRONFEL:  -- assuming that he said that he wanted to --

THE COURT:  Overruled.

A.   He wanted to come to Iowa, but I told him there was no place for him to stay at Mother's house. It was like a hospital at that time, and there was barely room for me.  And I told him he would have to get a hotel.  When I told him that, he said, Well, then, why don't you meet me in Dallas.

Q.   (BY MR. SCARBOROUGH)  So is it -- was it his idea to meet in Dallas?

A.    Yes, sir, it was.

Q.    Did you meet him in Dallas?

A.    I did.

Q.    Did you spend a weekend there together?

A.    I did.

Q.    Stayed in the same hotel or motel room?

A.    Yes, sir, we did.

Q.    From when to when?

A.    It was the weekend before Christmas.  And it was -- he picked me up on a Friday and took me back to the airport at DFW on Sunday morning.

Q.    At that point in time did you -- had you found the condo that you wanted to buy and ultimately bought in February of '11?

A.    I had found a number of properties, but there wasn't a specific property that I was trying to focus on.

Q.    My question that you didn't answer is, had you found the specific one that you bought in February?

A.    I'd seen it, yes, sir.

Q.    You'd seen it.

A.    Yes.

Q.    Okay.  Did you -- so you had a number of properties?

A.   Yes, I -- yes.

Q.   Okay.  Did you know how much money was going to be needed to close that house?

A.   There was never a discussion about specific amounts or specific property.

Q.   Okay.  You understand that the merits of this case -- Mr. Farris says -- we're going to argue that but we're not today.  He says it was a loan; you say it was a gift.  Correct?

A.   Yes, sir.

Q.   Okay.  Is there any dispute about the fact that whether it was a loan or whether it was a gift, that the money was provided by Mr. Farris?

A.   There is no dispute.

Q.   And when did that money come?

A.   In February 2011.

Q.   Okay.  Was there any agreement reached between you and him while you were there in Dallas, or was it a general discussion?

A.   It was a discussion.  It was more of a visit.  It wasn't just about this topic, but there was just a general discussion about it.

Q.   Okay.  You heard what he said the weekend was about --

A.   Yes, I have.

Q. -- in his deposition.

A. Yes.

Q. What did he say in his deposition that the weekend was about?

A. He just wanted to get together.

Q. With regard to the closing, from the time you first talked about it in November of 2010 until it closed in February 28 of 2011, did you ever come back to Texas for any reason regarding that?

A. No, sir, I didn't.

Q. Were there communications by e-mail and telephone during that period of time?

A. Several, yes. There was a lot of communication.

Q. Was Mr. Farris required by the lender to provide financial information and detailed information?

A. Yes, sir, he was.

Q. And did he provide that information either to you or directly to the lender?

A. Yes, sir, he did.

Q. And was there initially going to be a traditional mortgage?

A. We were both under the assumption that would be the way to go, and so that's what we applied

for, was a traditional mortgage.

Q. Was that granted or not?

A. No. It was turned down by two different sources.

Q. Okay. Having to do with you, him or both?

A. Both.

Q. And from then was there another method of financing?

A. There was. I was with my mother at the kitchen table when we found out that we couldn't get a mortgage. The first mortgage had been declined. And she called a friend of hers named Gary Buelt that was a vice president of an Iowa bank and explained the situation and that how I would be going to work and I was going to be staying in Iowa, and that my ex-husband was going to be gifting this money.

And he introduced us to -- or me, I had never met her before, Yvonne Silvers. And she was with Bankers Trust, and that's the person that tried to work out financing for us.

Q. Do you know -- did that person communicate directly with the plaintiff regarding this transaction?

A. Yes, she did.

Q. How do you know that?

A.   I know that because not only did I see him copied on e-mails, but I would talk to him about what was at hand or whatever had happened that day, and he would tell me that he had talked to her.

Q.   All right.  Now, after the closing, were you asked for and did you provide a copy of the closing papers?

A.   Yes, sir, I did.

Q.   And in the deed there is -- it may or may not be in evidence, depending on the Court's ruling. Are both your names in the deed typed in there and his name stricken out?

A.   Yes, sir.

Q.   Did you have anything to do with striking that name out of there?

A.   Absolutely not.

Q.   Was -- were you -- were you surprised when you saw that, or did you know about it ahead of time?

A.   I was surprised when I first saw it because we were not accepted to have a traditional mortgage. What Yvonne came up with was a line of credit note that was going to be in-house in the bank where she could do a three-year note that was based on treasury bonds and that I could later turn it into a traditional mortgage.  But it was a solution because

I didn't have a job at that time and --

MR. OCHOA-CRONFEL: I'm going to object to the answer as not responsive, Your Honor.

THE COURT: Sustained.

Q. (BY MR. SCARBOROUGH) All right. Let me just -- let's go question and answer. That's what the rules are.

A. Okay.

Q. Did you mail him the information and, in that, did it contain a deed where his name was stricken?

A. Yes.

Q. Were you trying to hide that in any way?

A. Absolutely not.

Q. Did you know about it -- at the time prior to the closing did you know that's the way it was going to be?

A. Yes, sir, I did.

Q. And did you have a conversation with Mr. Farris so that he knew about that?

A. He knew the same information that I did.

Q. Okay. You understand he says he didn't?

A. I hear that.

Q. Okay. Now, when did you mail all those closing documents to him?

A.    I believe I was able to get copies of everything and I sent it to him in April 2011.

Q.    The documents that Mr. Cronfel has -- I think his envelope says April 21st, 2011.

A.    That sounds right.

Q.    Now, everything with regard to this transaction happened between November of 2010 and when you mailed him all of the information in -- on April the 21st of 2011.

A.    Yes, sir.

Q.    Very briefly, I want to go through all of your contacts in Texas since the December -- we've already covered that one.

A.    Okay.

Q.    All right.  So let's move on.

Post-closing, when's the first time you ever came back to Texas after that closing, February of 2011?

A.    After my mother passed away in February 2012.

Q.    So a year later?

A.    Yeah.

Q.    And the purpose of that was to do what?

A.    They wanted to have a ceremony up in Farmersville and try to bury her ashes at a family

grave.

Q. Okay. After that, when's the next time you came back to Austin for any -- to Texas for any reason?

A. I believe it was for James Armstrong's 80th birthday.

Q. So you -- is he a friend of yours?

A. He's a dear friend. He's like a family member, but we're not related.

Q. Give me the date on that.

A. It was a big event at the Driskill. It was like a three-day event. And it was --

Q. I want the date.

A. It was -- May 10th, I believe, was his birthday. So I flew in that week.

Q. And did that coincide with one of your children's birthdays?

A. My son's birthday was that Sunday, May 13th. And so if -- I wanted to go to the party but also see my son for his birthday.

Q. And are those the reasons that you came back, for the birthday party of your friend, 80th, and for your son?

A. Exactly.

Q. While here, did you give Mr. Farris a check

for $15,000?

A.   I did.  I brought it to him in person.

Q.   Was that in repayment of a loan or something else?

A.   No.  It was not a repayment for a loan.  He had said he was having some financial problems with payment from clients of his business.  He didn't go into detail, but I told him I would do what I could, and I gave him a check for $15,000.

Q.   That was May of 2012?

A.   Yes, sir.

Q.   When's the next time you came to Texas for any reason?

A.   I believe it was the following spring, 2013.  This is when my mother -- her estate's finally wrapped up.  And I knew that my son was getting married, and I wanted to take a trip down to Austin to see what the prospects were if I did come back.

Q.   Prospects for coming back to Texas?

A.   Right, coming back to Austin.

Q.   Do you know what month that was in '13?

A.   I believe it was June, Two Thousand -- wait.  Yeah, 2013.

Q.   Okay.

A.   June.

Q.   And did you interview for a job while you were here?

A.   I did.

Q.   Did you get that job?

A.   I did not.  I interviewed on the phone when I was in Iowa, and they wanted me to come see them, and that's why I came down, was for the interview.

Q.   Very briefly because we've already touched on it, you moved back in what month?

A.   I moved back the end of July, first of August, 2013.

Q.   And you lived here -- by the way, did you rent a place, or did you live rent free?

A.   I stayed at a friend's guest house out in Lakeway.  They live primarily in Florida.  And so I just stayed as a guest.

Q.   Now, you testified earlier that all your belongings had been shipped up to Iowa in December of 2010.

A.   Yes, sir.

Q.   Did they stay in Iowa?

A.   My belongings never left Iowa because I didn't know what was going to happen in Texas, and I didn't have a place.  So everything stayed in Iowa.

Q.   And your son's wedding was February of --

A.    February 28 of 2014.

Q.    And were you -- during that period of time you got a job, I think you've testified to.

A.    Yes, sir.

Q.    You used your Texas real estate -- not real estate.  Excuse me.

A.    Insurance.

Q.    Texas insurance license.

A.    Yes, sir.

Q.    In part of your work while you were here.

A.    Yes, sir.

Q.    And, in fact, did Mr. Farris even -- did he ask you to do any work for him?

A.    He asked me for an insurance quote for some car insurance, but he never took out insurance with me.

Q.    Okay.  And you did that while you were in Texas for him?

A.    Yes, I did.

Q.    And when did you move back to Iowa?

A.    I moved back to Iowa the end of April, 2014.

Q.    And with regard to anything that touches on Texas, you've already testified that you've changed your licenses in September of '14; is that right?

A.   Yes.

Q.   Iowa to a resident in Texas to a nonresident.

A.   Yes, sir.

Q.   Now, again, why was the delay -- if you went back in April, why did you wait till September to do that?

A.   Because I didn't have a permanent address. You don't want to put down a temporary address on a record for a document, so I waited until we closed on a house.

Q.   And did you have a job?

A.   And I didn't have a job.  I started in September.  So that's when I changed it.

Q.   Okay.  Does Iowa have a state income tax?

A.   Yes, they do.

MR. SCARBOROUGH:  I'd like to have these marked.

*(Defendant's Exhibits Nos. 1 through 4 were marked.)*

Q.   (BY MR. SCARBOROUGH)  These are Exhibits 1 through 4.  Would you identify them for the Court?

MR. SCARBOROUGH:  And for the record, Your Honor, Mister --

A.   These are copies --

Q.   (BY MR. SCARBOROUGH)  Hold on.  Let me say something.

A.   Oh, I'm sorry.

MR. SCARBOROUGH:  Mr. Cronfel has said he has no objection to these.

Q.   (BY MR. SCARBOROUGH)  What are they?

MR. OCHOA-CRONFEL:  That's correct, Your Honor.

THE COURT:  I'll go ahead and admit 1 through 4.

*(Defendant's Exhibits Nos. 1 through 4 admitted.)*

A.   They're copies of my tax returns from 2010 to 2013.

Q.   (BY MR. SCARBOROUGH)  Why do you have to file the tax returns?  Were you there the entire year of 2010?

A.   No, but that's where I was living when it was time to do the taxes.

Q.   If you lived in Iowa for any part of the year, do you have to file a tax return?

A.   For their state income tax you file a separate return.

Q.   Okay.  And then in '11 you filed one?

A.   I did for the two months that I was there

for November and December.

Q. For -- that would be --

A. In 2010.

Q. -- '10. You filed one for '11?

A. I did.

Q. Filed one for '12?

A. Uh-huh.

Q. Is that correct?

A. Yes, sir.

Q. You filed one for '13, even though you weren't there the whole year?

A. No, but I filed one for the time I was there.

Q. And then in '14 -- we don't have '14 for some odd reason. I'm not sure why. Did you file one for '14 as well?

A. Yes, sir, I did.

Q. And for the period of time you were in Iowa when you we want back?

A. Yes. They prorate for only the time here in the --

MR. OCHOA-CRONFEL: I'm going to object to the leading nature of the questions again, Your Honor.

THE COURT: Sustained.

Q.   (BY MR. SCARBOROUGH)  Did you file a tax return, even though we don't have a copy of it, Iowa state income tax return for 2014 for the portion of --

A.   Yes, sir, I did.

Q.   -- for the portion of the year that you were there?

A.   Yes, sir.

MR. SCARBOROUGH:  Pass the witness.

**CROSS-EXAMINATION**

BY MR. OCHOA-CRONFEL:

Q.   Ms. Landa, this lawsuit centers around Mr. Farris providing some money that you used as a down payment on a house that you purchased in Iowa. Correct?

A.   A house that was purchased in Iowa, yes.

Q.   Okay.  And you don't dispute that Mr. Farris provided the money.  Correct?

A.   Absolutely not.

Q.   Okay.  So the big dispute is to what -- the big dispute is as to whether or not the money was a loan or a gift; isn't that correct?

A.   Yes, sir.

Q.   Okay.  So beginning sometime in December 2010 and going through at least February of

2011, you and Mr. Farris were having discussions over the phone regarding his providing money for -- as a down payment for the purchase of this house. Correct?

A. Yes, sir.

Q. Okay. And some of those discussions took place -- those communications, they took place via e-mail, correct, some of them?

A. I would send him --

Q. Okay. And some of --

A. -- copies of --

Q. -- them took place over the telephone. Correct?

A. I would send him e-mails of listings that I saw.

Q. Okay. And some of them took place face to face, i.e., Dallas. Correct?

A. Yes, sir.

Q. Okay. And some communications involved correspondence in the form of e-mail between you, Mr. Farris and third parties, such as realtors or bank personnel. Correct?

A. Yes, sir.

Q. Okay. And throughout all of these contacts between you and Mr. Farris, Mr. Farris was a resident

of Texas.  Correct?

    A.    Yes, sir.

    Q.    Okay.  And you were aware that Mr. Farris was a resident of Texas.  Correct?

    A.    Yes, sir.

    Q.    Okay.  And you were aware that you were obtaining funds that you would be using for a down payment on the purchase of a house from a resident of Texas.  Correct?

    A.    He was -- yeah, he lives in Austin.

    Q.    Okay.  In your discussions with Mr. Farris regarding these funds, you represented to him -- did you represent to him that his name would be on a deed?

    A.    I was totally on board for that.  That was our agreement.

    Q.    Okay.  But his name was stricken from the deed regarding the house.  Correct?

    A.    The house did not get what we -- his name -- his name was scratched off on the deed.

    Q.    Okay.  So ultimately on February 24th, 25th, there were two separate wire transfers from Mr. Farris here in Texas to a bank in Iowa which comprise the down payment on the house in Iowa; is that correct?

A.    That was part of the requirements from the bank, was that we had a bank account there for the transaction.

Q.    So those two wires came in the form of -- the money came in the form of two wires from Texas in February of 2011.  Correct?

A.    Yes.  And the account was --

Q.    And they came from my client who was a Texas resident.  Correct?

A.    Yes.  The account was --

Q.    And the money came --

THE COURT:  Okay.  Guys?

MR. OCHOA-CRONFEL:  I'm sorry.

THE COURT:  You cannot talk over each other --

MR. OCHOA-CRONFEL:  Sorry.

THE COURT:  -- if you want her to make a record.

MR. OCHOA-CRONFEL:  Sorry about that, Your Honor.

MR. SCARBOROUGH:  Were you saying something?

A.    The account was set up in both our names as per the original application that we requested for the loan.

Q.    (BY MR. OCHOA-CRONFEL)  And the money came from Texas.  Correct?

A.    Yes, sir.

Q.    Okay.  And on February 28, 2011, thanks at least in part to the money provided by Mr. Farris for the down payment, you closed on the house.  Correct?

A.    Yes.

Q.    Okay.  Now, after you closed on the house, you and Mr. Farris continued to have contact regarding the transaction.  Correct?

A.    We -- we had constant contact through this period.

Q.    Okay.

A.    And he knew that he wasn't going to have to sign any documents.

Q.    Okay.  Well, he asked you about the closing documents, didn't he?

A.    He wanted -- yes, he asked for -- and I sent him a copy.

Q.    And in April 2011 you sent him a package that you contend contained those closing documents in response to those inquiries.  Correct?

A.    I sent him a copy of everything I had.

Q.    Okay.  And after you sent him that package, you and Mr. Farris continued to have contact

regarding the transaction.  Correct?

A.    Yes.

Q.    And that was regarding telephone -- by telephone?

A.    Telephone, e-mail, text.

Q.    And.  Now, he discussed with you paying back that loan during that time, didn't he?

A.    He only brought up payment for that loan when I would not let him come see me because my mother was terminally ill.  And he would bring it up as a threat.

Q.    Okay.  In May 2012 you traveled to Austin.  Correct?

A.    Yes, sir, I did.

Q.    Okay.  And that trip was between May 9th and May 13th.  Correct?

A.    Yes, sir.

Q.    Okay.  And during that trip you gave Mr. Farris a check for $15,000; is that correct?

A.    I did.

Q.    Okay.  And you characterized that money as a gift from you.  Correct?

A.    He has -- I did not use that word, but he has helped me in the past, and I was able to help him and so I helped him as well.

Q.    And you previously stated in your testimony a few minutes ago that -- that he was having some financial problems; is that correct?

A.    That's what he told me.

Q.    Okay.  Now, you remember your deposition, Ms. Landa.  Correct?

A.    Yes, sir.

Q.    Day before yesterday.

A.    Uh-huh.

Q.    Okay.  Do you remember stating in that deposition that -- bear with me one second here.

You remember stating that my client has plenty of money?

A.    I stated that because that was a different time.  He -- from 2013 -- later he inherited, after his mother passed away, and he told me he was doing very well and buying other real estate in Austin.

Q.    And in fact you know that my client has never had trouble with money; isn't that correct?

A.    I don't know exactly what Lee's finances are, only what he tells me.

Q.    Okay.  So -- all right.

Court's indulgence.

Now, after Mr. Farris gave you that check, you and Mr. Farris continued to have contact

regarding the transaction. Correct?

A. We had -- he was always calling me or checking on me, yes.

Q. Okay. And he continued to ask you about getting paid back on that loan, didn't he?

A. He would bring it up when I would not want him to come to Iowa to see me.

Q. Now, in May 2013, you sent Mr. Farris a note via the U.S. mail, didn't you?

A. Yes, I did.

Q. Okay. And that note, which was dated May 29th -- and I'll show it to you if you need me to -- 2013, thanked Mr. Farris for some money --

MR. SCARBOROUGH: Excuse -- excuse me. He's talking about a piece of evidence that's not been admitted yet. And I believe it's one of the ones to which I have an objection because I believe it goes to the merits of the case on whether it was a gift or a loan, if it's what I'm thinking it is.

MR. OCHOA-CRONFEL: May I approach, Your Honor?

THE COURT: Yes.

Are you going to mark it?

MR. OCHOA-CRONFEL: Yes. Yes, ma'am. Well, I'll just put a number on it.

MR. SCARBOROUGH: What number is it?

MR. OCHOA-CRONFEL: No. 1, sir. That's our first.

THE COURT: Any objection to 1?

MR. SCARBOROUGH: Yes.

MR. OCHOA-CRONFEL: Yes, Your Honor.

MR. SCARBOROUGH: I do have an objection to 1.

THE COURT: Go ahead.

MR. OCHOA-CRONFEL: Okay. And --

THE COURT: No, no, no. What is the objection?

MR. SCARBOROUGH: My objection is relevance as to this hearing because this goes to whether it was or was not a gift. It's not relevant to this dispute. The time frame of this is May of 2013. And it's talking about whether -- this literally goes to whether it was a loan or a gift.

THE COURT: Why is this relevant to this hearing?

MR. OCHOA-CRONFEL: It's -- it's relevant for two purposes, Your Honor: It's relevant to show ongoing contacts as is required by the law, contacts whether by mail, by phone, by e-mail, or by personal appearance. So it goes to the minimum

contacts for jurisdictional purposes. But it's also relevant, Your Honor, to show the credibility of the witness or the lack thereof.

THE COURT: How much -- how much money did he give her?

THE WITNESS: For the loan on the house? $88,000.

THE COURT: Okay.

MR. OCHOA-CRONFEL: And, Your Honor, further, the note -- this note references the transaction that we're speaking about.

THE COURT: The objection is overruled.

1 will be admitted.

*(Plaintiff's Exhibit No. 1 admitted.)*

MR. OCHOA-CRONFEL: Okay. May I approach the witness, Your Honor?

THE COURT: Yes.

A.    Thank you.

Q.    (BY MR. OCHOA-CRONFEL) Okay. Now, Ms. Landa, you're looking at Plaintiff's Exhibit No. 1. Do you recognize that note?

A.    Yes, sir, I do.

Q.    And is that from you?

A.    Yes, sir, it is.

Q. Okay. And that note references a -- that note references an additional 15 -- 10,000-dollar loan that you obtained from my client right around that time; is that correct?

A. I'm not sure what that 10,000 represents.

Q. Okay.

A. It could -- it might have been something other. I don't think that's the case.

Q. And it also -- it also references that you paid my client $15,000 in 2012. Correct?

A. I wrote him a check for 15,000.

Q. Right. And nowhere does it say it's a gift. Correct?

A. No, it doesn't say that.

Q. And it further says, at the bottom toward the end, "I thank you for your love and support in my life. I do not have figures from the house closing with me from 2011 but hope that this will suffice." Correct?

A. Uh-huh.

Q. All right.

MR. SCARBOROUGH: Let me remind you not to say "uh-huh"; to speak audibly.

THE WITNESS: Yes, sir.

A. Yes, sir.

THE WITNESS: Thank you.

Q. (BY MR. OCHOA-CRONFEL) Now, after you sent this note, you and Mr. Farris continued to have contact regarding the transaction. Correct?

And when I say "the transaction," I'm referring to the closing of the house and the loan of the money. Correct?

A. We -- we talked, but it wasn't just about a transaction.

Q. But you talked about that transaction and that money. Correct?

A. We talked about a lot of things but, yes, that was maybe something that he would bring up.

Q. Okay. And he continued to ask you to get -- get paid back, didn't he?

A. He would bring up the money when there was something that I wasn't doing to please him, or I wasn't letting him come see me.

At the time this note is written, I've just learned that our son is going to get married, and I'm trying to do everything I can to be supportive. And it's a very happy note, and that's what was making me consider moving back to Texas, to be part of this.

MR. OCHOA-CRONFEL: And I object to

the nonresponsiveness of the answer, Your Honor.

THE COURT: Sustained.

MR. OCHOA-CRONFEL: Okay.

Q. (BY MR. OCHOA-CRONFEL) My client, after this time, at various periods in time, would ask you to pay back the note. Correct?

A. Yes. He would bring up --

Q. All right.

A. -- a lot of things.

Q. And, in fact --

MR. OCHOA-CRONFEL: And I think you've objected to this one, too, Mr. Scarborough, so we're going to have to address that.

It's this text, the text. You objected to the text. Right?

MR. POTTER: Which one is that?

MR. OCHOA-CRONFEL: Give me -- 144.

MR. SCARBOROUGH: Which one?

(Discussion off the record.)

MR. OCHOA-CRONFEL: It's this one.

MR. POTTER: What's the Bates number?

MR. OCHOA-CRONFEL: 150, sir.

MR. POTTER: 150.

MR. OCHOA-CRONFEL: You objected to this. Correct?

MR. SCARBOROUGH: Yes.

MR. OCHOA-CRONFEL: Okay. May I approach, Your Honor?

THE COURT: Yes.

Are you going to mark this?

MR. SCARBOROUGH: Give her the one that's got the --

MR. OCHOA-CRONFEL: Oh, I'm so sorry. I apologize, Your Honor.

THE COURT: That's okay.

Any objection to 2?

MR. SCARBOROUGH: Yes, Your Honor. Again, you'll notice what the highlighted -- or I assume it's highlighted. It's dated September the 30th of 2014. For the record, I will state -- we haven't gotten there yet, but there was a demand letter from Mr. Cronfel dated in late August. This is after that fact. And it talks about -- it goes only to the issue of merits of the case because he's saying, I loaned you money. I'm supposed to be the co-owner. That goes to his merits of the claim, but it doesn't have anything to do with the hearing that we're here for today.

I object to it on the basis of relevance to today's hearing.

THE COURT: Mr. Ochoa-Cronfel?

MR. OCHOA-CRONFEL: Your Honor, it's going to be the same argument I posed before. This is another contact. Under the case law, this constitutes a contact for jurisdictional purposes, and it also impacts on the credibility of the witness, Your Honor.

THE COURT: Overruled.

2 will be admitted.

*(Plaintiff's Exhibit No. 2 admitted.)*

Q. (BY MR. OCHOA-CRONFEL) Ms. Landa, I've -- you've been handed what's been marked as Exhibit No. 2. And I'd like you to look at the highlighted portion of the date of September -- September 30th, 2014. Do you see that there?

A. Yes, sir.

Q. Okay. And can you read out -- and this is from my client, Mr. Farris. Correct?

A. Yes, sir.

Q. Okay. Can you read to the Court what it says?

A. "Don't even go there. You did send or gave me a check for 15,000 and I loaned you back 10. Don't make me out to be the bad guy. I've done everything to help you and all I get is the wrath of

Karen. All I did was take" and I'm -- it cuts off on the transcript.

Q. Okay. Ms. Landa, I'm sorry but you didn't read the part I was asking you to. It's the second one where it's --

A. Oh, okay.

Q. -- September 30th, 2014, ma'am.

A. "There is no need for us to talk because we can't. All I get is verbal abuse. The fact is that I loaned you large sum of money to buy a house that I was supposedly co-owner. You said you would pay me back when your mom" -- and it cuts off.

Q. Okay. Thank you.

So, in fact, you and Mr. Farris had numerous contacts in person, via e-mail, via phone, via text, via regular mail over the course of approximately the last five years regarding this transaction in which he provided you money for the down payment on the house; isn't that correct?

A. We talked about a lot of things, not just about the house. The only time he brought it up is when he was upset that I didn't want to see him or have anything to do with him. And he used it as a way to get me upset.

Q. Now, Ms. Landa, you lived and worked in

Austin, Texas, for the better part of the last 20 years. Correct?

A. Yes, sir.

Q. Okay. Well, you -- and you only lived in Iowa from November 2010 through July -- through July 2013, and May 2014 to the present. Correct?

A. I grew up in Iowa.

Q. That was not my question, ma'am.

A. Okay.

Q. Shall I try it again?

A. Will you, please --

Q. Yeah.

A. -- restate the question?

Q. Okay. During the last 20 years, let's just put it that way, you only lived in Iowa from November 2010 through July 2013. Let's start with that. Is that correct?

A. Yes, sir.

Q. Okay. And after that, from May 2014 to the present; is that correct?

A. Yes, sir.

Q. Okay. All right.

Now, you've held an insurance license with the Texas Department of Insurance from April 1987 to the present; isn't that correct?

A.    Yes, sir.

Q.    Okay.  And, in fact, as recently -- and I think you testified to this before.  As recently as January 2014, you were working on getting insurance quotes from my client, Mr. Farris, correct, here in Texas?

A.    He asked for me to prepare an insurance proposal for him, and I did.

Q.    Okay.  So the answer is yes?

A.    Yes.

Q.    Okay.  And you were doing business in Westlake as Karen Landa Insurance during 2014.  Correct?

A.    I opened up my agency December 1st, 2013.

Q.    And, in fact, as recently as May 2014 and August -- and August 2014, you were a member and/or sponsor of the Westlake Hills Chamber of Commerce.  Correct?

A.    I joined the Westlake Hills Chamber of Commerce when I was hired by American National Insurance as part of my marketing strategy to try to build an agency that was to be opened.

Q.    So what I stated is true.  Correct?

A.    I'm not sure what you're referring to is in print.  I'm not sure what it is that you're asking

me, but I did join the Chamber of Commerce for Westlake.

Q. And that would be May of -- May of 2014 and August of 2014. Correct?

A. No. No, sir. I joined it back in 2013 when I took the position.

Q. Let me ask the question again.

In fact, as recently as May of 2014 and August of 2014, you were a member and/or sponsor of the Westlake Hills Chamber of Commerce. Correct?

A. I joined the Westlake Hills Chamber of Commerce in the fall of 2013 and it was a 12-month payment that I made as a member. I no longer participated, but because I paid an additional amount of money, I think they used my name for promotions that they may have had, but I was not here.

Q. Ms. Landa, do you remember responding to a set of discovery from my client?

Do you remember responding to a set of discovery from my client?

A. Yes, sir.

Q. And it -- and it included requests for admissions? Do you remember that?

A. Yes, sir.

Q. And one of the admissions was that --

MR. SCARBOROUGH: Which one are you talking about?

MR. OCHOA-CRONFEL: I'm talking about No. 14.

Q. (BY MR. OCHOA-CRONFEL) And as recently as -- and I'll read it to you. Request for Admission 14, Please admit that as recently as 2014, Karen Landa Insurance was a member of and a sponsor of the Westlake Hills Chamber of Commerce.

MR. SCARBOROUGH: Wait. Wait. That was misread.

What it says is, to admit that as recently as 2014, Landa Insurance, Karen Landa, was a member of and/or a supporter of the Westlake Hills Chamber of Commerce, not both.

MR. OCHOA-CRONFEL: Right. That's what I said.

Q. (BY MR. OCHOA-CRONFEL) Do you remember admitting to that?

A. Yes. I signed up for a year membership in 2013.

Q. Okay. Thank you.

Now, in the many years you spent living and working in Austin, you've also worked with a number of nonprofit groups here; isn't that

correct?

A.    Yes, sir.

Q.    And one of those groups was Austin Hospice Community Foundation, and you were on the board of directors.  Correct?

A.    Yes, sir.

Q.    And you were also a docent of the Texas Governor's Mansion.  Correct?

A.    Yes, sir.

Q.    Okay.  Now, you are also the beneficiary of a marital trust that's here in Texas.  Correct?

A.    Yes, sir.

Q.    Okay.  And that trust is out of Frost Bank.  Correct?

A.    They're my trustee.

Q.    Yeah.  And you've been receiving monthly disbursement from that trust of Frost Bank here in Texas for a number of years.  Correct?

A.    That was set up per my husband's will.

Q.    Is that correct?

A.    Yes, sir.

Q.    Okay.  And you've been receiving it, notwithstanding the fact that you're in Iowa -- when you live in Iowa.  Correct?

A.    It doesn't matter where I am; I get the

distribution.

Q. And you will continue to receive the monthly disbursement from that trust here in Texas at Frost Bank until you die. Correct?

A. Yes, sir.

Q. Okay. Now, you have a cell phone number -- current cell phone number that has an Austin area code. Correct?

A. Yes, sir.

Q. Okay. And you've had that same telephone number for quite a while. Correct?

A. I've kept that because that's how I keep in -- that's how people know me. That's how I list it on credit cards or any kind of business.

Q. All right. Ms. Landa, real quick, I want to draw your attention to the special appearance you filed in this matter.

MR. OCHOA-CRONFEL: Your Honor, may I approach?

THE COURT: Yes.

MR. OCHOA-CRONFEL: I would like the Court to take judicial notice of this pleading. And I guess I better mark it because I'm going to use it as an exhibit.

MR. SCARBOROUGH: Your Honor, I don't

think our special appearance should be an exhibit because it's part of the Court's record. It's -- without ever being admitted as a --

THE COURT: This is your special appearance?

MR. SCARBOROUGH: It's my --

THE COURT: I can just take judicial notice of it. It's in the record.

MR. OCHOA-CRONFEL: Okay.

Q. (BY MR. OCHOA-CRONFEL) Now, let's look, amongst the other things -- let's look at Paragraph 2-b. Okay? And it says here in 2-b, "Defendant does not now engage and has not engaged in business in Texas or committed any tort, in whole or in part, within this state."

Did I read that correctly?

A. Yes, sir.

Q. That's not true, is it?

A. No -- the business that's referred to here is this lawsuit.

Q. Okay. And you -- you swore to this. There's a -- if we turn to the second to the last page, ma'am.

A. Yes, sir.

Q. Let's go back over that. That's your

signature on the verification.  Correct?

A.    Yes, sir.

Q.    Okay.

A.    I'm not an attorney, but this -- this business, I thought it was --

Q.    Ma'am, I --

A.    -- I thought it referred to the lawsuit, sir.

Q.    Now, we've discussed a plethora of ways in which you've done business in Texas, correct, today?

A.    Yes, sir.

Q.    Now, let's look at 2-d, "Defendant has no substantial connection with Texas arising from any action or conduct of defendant purposefully directed toward Texas."

Did it read that correctly?

A.    Yes, sir.

Q.    Okay.  And that -- that's not true, is it?

A.    That is true, sir.

Q.    Okay.

A.    What is my -- I mean, what is my substantial connection?

Q.    We'll just leave that -- we'll just leave that the way it is.

Let's go to E.  Okay.  We're just

about done here, Ms. Landa.  I just want to touch on a couple other things.

Now, you remember testifying -- well, let me ask you this question:  Has Mr. Farris ever loaned you money?

A.    He has helped me when I needed help and he was able to do so, so yes.  He's helped -- he's given me money in the past.

Q.    Okay.  But has it been -- in your opinion, has it been in the form of a loan, or of a gift?

A.    They were gifts.

Q.    So is it your testimony that none of the -- none of the money that Mr. Farris has given you --

MR. SCARBOROUGH:  Objection, Your Honor.  Now we're really going far afield because now we're talking about money that's not related to this lawsuit.  And the plaintiff, by his own admission, is suing the defendant for the money that was related to the purchase and acquisition of the Iowa property.

He's now talking about other money that's not even related to this lawsuit.  I object to it on the basis of relevance.

THE COURT:  Mr. Ochoa-Cronfel?

MR. OCHOA-CRONFEL:  Your Honor, this goes directly to credibility.  And the reason why

this is important is because she has testified in her deposition that all of the money that my client gave her was in the form of gifts. And I'm going to impeach her about that because I have evidence that I want to submit that will show directly otherwise.

MR. SCARBOROUGH: And, again, that evidence has to do with money that he gave her from March of -- March of 2010?

MR. POTTER: Yes.

MR. SCARBOROUGH: -- March of 2010 through July of 2010. I believe that's correct.

And that's -- and it's not involved -- that -- that money is not involved in this litigation. I object to it, Your Honor.

MR. OCHOA-CRONFEL: Your Honor, Ms. Landa has testified that all of the money my client has given her has been a gift. My client testifies the very opposite. Those go to the operative facts on the ground that relate to the jurisdictional issues in this case and also go to credibility.

THE COURT: I'm going to overrule the objection.

I'm going to -- we're going to take a break. I'll let y'all know both of y'all are at 47

minutes, so that gives you about 28 minutes.

MR. OCHOA-CRONFEL:  I'm sorry, Your Honor; I didn't hear that last part.

THE COURT:  Y'all are at 47 minutes.

MR. OCHOA-CRONFEL:  Okay.

THE COURT:  So y'all -- each one has, if I'm counting that right -- that's 28 minutes.

MR. OCHOA-CRONFEL:  Yes, ma'am.

THE COURT:  Okay.  We'll take a 15-minute break.

MR. OCHOA-CRONFEL:  Thank you.

THE WITNESS:  Thank you.

(Recess taken.)

THE COURT:  You may proceed.

MR. OCHOA-CRONFEL:  Thank you, Your Honor.

May I approach?

THE COURT:  Yes.

Q.    (BY MR. OCHOA-CRONFEL)  Ms. Landa, I'm handing you what's been marked as Exhibit No. 4.

MR. SCARBOROUGH:  For the record, I assume -- does this include all four checks?

MR. OCHOA-CRONFEL:  Yes, sir.

MR. SCARBOROUGH:  For the record, I'm objecting to these, Your Honor, because you'll note

that the date on them is from March of 2010 through July of 2010. They involve loans -- alleged loans which the defendant will testify is different. They weren't loans. But it -- but by the plaintiff's own admission, they are not involved and are not being sued on in this lawsuit. So we object to them for that purpose.

THE COURT: What's the relevance of these?

MR. OCHOA-CRONFEL: Your Honor, the relevance of these are, again, to show continuous contacts for general --

THE COURT: These are from 2010?

MR. OCHOA-CRONFEL: Right.

THE COURT: So I think that these are -- I mean, I think she's already testified to this. If you want to spend, you know, the next 28 minutes showing me more checks, that's fine. But I don't think that this is necessary, unless we have something else that's different.

MR. OCHOA-CRONFEL: This -- this was really just for purposes of credibility with regard to the issue that all my -- all the money that my client provided to the defendant is gifts. That's it.

I was going to ask one or two questions, and I'm going to be done.

THE COURT: Okay. Overruled.

What number do you have?

MR. OCHOA-CRONFEL: No. 4, Your Honor.

THE COURT: 4 will be admitted.

*(Plaintiff's Exhibit No. 4 admitted.)*

Q. (BY MR. OCHOA-CRONFEL) Ms. Landa, do you recognize all four checks that are comprised of Deposition [sic] Exhibit No. 4?

A. Yes, sir.

Q. Okay. And these checks were checks from my client -- of monies from my client to you. Correct?

A. Yes, sir.

Q. Okay. And in the memo part, what does it say in each one of these checks?

A. Loan.

Q. Okay. All right.

One last question; Ms. Landa, it is -- is it unreasonable to believe that Mr. Farris, who provided you approximately $90,000 for the down payment on the house, didn't expect to get that paid back --

MR. SCARBOROUGH: Objection; relevance. What his expectations were has nothing to

do with whether this court does or does not have jurisdiction.

THE COURT: Sustained.

MR. OCHOA-CRONFEL: No more questions, Your Honor. Pass the witness.

THE COURT: Can I ask you a question? What -- the money, was it transferred to -- how -- how did that happen? What was the actual --

THE WITNESS: He wired it to an account, and I had sent him the information, like, for a signing card, you know --

THE COURT: Okay.

THE WITNESS: -- for a checking account. The bank did a line of credit note and they wanted the funds transferred to their -- in the bank.

THE COURT: That's fine.

Anything else, Mr. Scarborough?

**REDIRECT EXAMINATION**

BY MR. SCARBOROUGH:

Q. Just a couple of questions with regard to that -- Plaintiff's Exhibit I believe 4, those checks.

A. Yes, sir.

Q. Did you consider those checks, when that money was provided to you, to be a loan?

A. No, I did not.

Q. Why not?

A. Because he never brought it up, or never asked for payment about it, or made any reference to it. When he did things like this, it was usually with a -- he wanted to be close to me. The motivation was to have access to me. He might want a sexual favor. But there was always another intention behind this -- this money that he would give me.

Q. Okay. And did that money at all have anything to do with the closing in -- that took place in February of 2011, on the Iowa property?

A. It had nothing to do with the transaction on the condo.

MR. SCARBOROUGH: No further questions.

THE COURT: Anything else, Mr. Ochoa-Cronfel?

MR. OCHOA-CRONFEL: No, Your Honor.

THE COURT: Okay. You may step down.

MR. SCARBOROUGH: The defendant rests.

THE COURT: Mr. Ochoa-Cronfel?

MR. OCHOA-CRONFEL: Yes, Your Honor, I'm going to call Mr. Lee Farris to the stand.

THE COURT: Mr. Farris, come on up.

A.    No, I did not.

Q.    Why not?

A.    Because he never brought it up, or never asked for payment about it, or made any reference to it.  When he did things like this, it was usually with a -- he wanted to be close to me.  The motivation was to have access to me.  He might want a sexual favor.  But there was always another intention behind this -- this money that he would give me.

Q.    Okay.  And did that money at all have anything to do with the closing in -- that took place in February of 2011, on the Iowa property?

A.    It had nothing to do with the transaction on the condo.

MR. SCARBOROUGH:  No further questions.

THE COURT:  Anything else, Mr. Ochoa-Cronfel?

MR. OCHOA-CRONFEL:  No, Your Honor.

THE COURT:  Okay.  You may step down.

MR. SCARBOROUGH:  The defendant rests.

THE COURT:  Mr. Ochoa-Cronfel?

MR. OCHOA-CRONFEL:  Yes, Your Honor, I'm going to call Mr. Lee Farris to the stand.

THE COURT:  Mr. Farris, come on up.

Mr. Farris, can I have you raise your right hand.

(The witness was sworn.)

THE COURT: Please have a seat, sir.

(Discussion off the record.)

THE COURT: You may proceed.

MR. OCHOA-CRONFEL: Thank you, Your Honor.

**CHARLES LEE FARRIS,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. OCHOA-CRONFEL:

Q. Can you please state your name for the record?

A. Charles Lee Farris.

Q. Okay. And, Mr. Farris, where do reside?

A. ███████████████ , Austin, Texas.

Q. And how long have you resided in Austin, Texas?

A. Since 1976.

Q. Okay. Mr. Farris, what do you do for a living?

A. I have a brick business and a service company which I do various number of things for new construction homes.

Q.   Okay.   How do you know the defendant, Karen Landa?

A.   I know her from -- known her since 1981, I guess.

Q.   And what -- what has been your relationship with her?

A.   Well, we met in 1981, and we got married, had a couple of kids.

Q.   Okay.

A.   I think that's -- that was in '85 -- '84 and '85 on the children.

Q.   Did you get divorced?

A.   We did get divorced in '91.

Q.   Okay.  And how would you describe your relationship with her since the divorce?

A.   It's been a fairly good relationship. We've stayed in contact because of the children, and we've gotten along.

Q.   Why are we here today, Mr. Farris?

A.   Well, I loaned her some money for a down payment on a house, and she's refused to pay me back, and now we're in court.

Q.   Okay.  Can you describe the circumstances under which you came to loan this money to Ms. Landa to the Court, please?

A. She was in Iowa at the time, and she was taking care of her mom. She was living in her mom's house, and she did not want to stay there. She was having a difficult time living with her mom.

She had talked -- we had talked. We continually were talking about things, but she wanted to get her own place. And this is when she approached me as far as the meeting in Dallas, wanted to hook up and let's talk about things.

Q. Okay. When did this meeting in Dallas occur?

A. December 17th, 2010.

Q. 2010. And was -- was it at that meeting in Dallas that you understood for the first time that she was seeking money for a down payment on this house?

A. That's -- that's when we talked about -- yes.

Q. Okay. And did you reach an agreement with Ms. Landa with regard to her request for this money?

A. We did. We did.

Q. Can you tell the Court what the terms of that agreement were?

A. The agreement was that I would provide the down payment. There was no specific property, but

she was looking at property. And I would provide the down payment as long as I was on the deed. It was going to be a loan, to be paid back, as long as I was on the deed.

Q. Okay. And how were you going to get paid back?

A. She promised me she would pay me back on the death of her mom because she had a 150,000-dollar life insurance policy on her mom.

Q. Okay. And I think you testified that around that time her mom was ill when she visited with you in Dallas?

A. That is correct.

Q. Okay. All right. So did you agree to loan her that money?

A. At that point in time we agreed on the conditions of it, yes.

Q. Did you know how much the money -- how much -- what the amount the money was going to be at that time?

A. At that time, no.

Q. Okay. Why is that?

A. I don't think she had found a specific piece of property that she was going to purchase.

Q. Okay. So when you left -- when you-all

parted ways that weekend, what was your understanding?

A.    My understanding was she was going to go back to Iowa.  She had been looking at some property. I wasn't sure which property she was looking at.  But she was going to go back to Iowa and try to find a piece of property that she wanted to live in.

Q.    Okay.  Did you have contact with her soon thereafter?

A.    Yes.

Q.    How soon?

A.    The next day.

Q.    And what did that contact consistent of?

A.    I think she had found a piece of property that the bank had control of, and it needed to be finished.

Q.    How was that communication made to you?

A.    On the phone.

Q.    Okay.

A.    And e-mail.

Q.    Okay.  And what was contained in the e-mail?

A.    I believe she was stating that she had found a piece of property.  It was a townhome.

Q.    The --

A.     It was not finished.

MR. OCHOA-CRONFEL:  Did you object to this?  Let me show you.

MR. SCARBOROUGH:  What is it?

MR. OCHOA-CRONFEL:  It's Landa 006.

MR. SCARBOROUGH:  Yeah.

MR. OCHOA-CRONFEL:  You did?

MR. SCARBOROUGH:  I did.

MR. OCHOA-CRONFEL:  Okay.  May I approach, Your Honor?

THE COURT:  Yes.

MR. SCARBOROUGH:  Your Honor, on this one, as in most of the things I argue about is -- my objection is relevance to today's hearing.  It's an e-mail from Ms. Landa to Mr. Farris -- Ms. Taylor, excuse me -- talking about the price and things of that.  It just doesn't have anything to do with today's hearing.

We object to it for relevance.

THE COURT:  Why is this relevant?

MR. OCHOA-CRONFEL:  Your Honor, this is a contact.  It's a contact as is required under the case law to permit jurisdiction over the individual defendant.

THE COURT:  I'm going to sustain that

objection.

MR. OCHOA-CRONFEL: Okay.

Q. (BY MR. OCHOA-CRONFEL) So, Mr. Farris, did you have any other contacts besides that contact in that e-mail with Ms. Landa after -- after that e-mail?

MR. SCARBOROUGH: Objection to the form of that question because it implies something that's not in evidence.

THE COURT: Overruled.

A. Yes.

Q. (BY MR. OCHOA-CRONFEL) Okay. And what did those contacts consistent of, and what were they about?

A. It consisted of the house she was looking at, and we stayed in contact about the decorating, and what needed to be finished, and when the house -- when it was going to close, and things of that nature, pertaining to the house.

Q. Okay. And for how long did these contacts continue?

A. Up until the closing. Up until the closing.

Q. Okay. Mr. Farris, I'm handing you what's been marked as Exhibits 6 and 7. Can you please

identify those exhibits?

MR. SCARBOROUGH:  No objection, for the record.

A.    Those are bank statements.

THE COURT:  6 and 7 will be admitted.

*(Plaintiff's Exhibits Nos. 6 and 7 admitted.)*

Q.    (BY MR. OCHOA-CRONFEL)  Okay.  And are those your bank statements?

A.    They are my bank statements.

Q.    And what do those bank statements reflect?

A.    They reflect a wiring of money up to Bankers Trust in Iowa.

Q.    Okay.  And let's look at No. 6 there.  How much does that -- and that's the wiring of the $22,179.86.  Correct?

A.    Correct.

Q.    Okay.  And then if we look at the next one; I believe it's No. 7.  We go to Page 3 of that.  That reflects a wiring of what, two-thirds -- three -- two-thirds of the way down?  Page 3 of No. 7.

A.    Oh, that would be $87,000.

Q.    Are you sure?  Look that number.

A.    Oh, I'm sorry.  67,000.

Q.    Okay.  So you wired 22,000-something

plus -- and 67. About approximately $89,000?

A. That is correct.

Q. Okay. From Texas to Iowa?

A. That is correct.

Q. Okay. Now, did this -- did the closing on the purchase of the property in Iowa -- the townhome in Iowa occur?

A. Yes, it did.

Q. Okay. Now, did you have contacts with Ms. Landa after the closing?

A. I did.

Q. And what did those contacts consist of?

A. Mainly I wanted to get copies of the closing papers, the closing costs of the townhome.

Q. Okay.

A. I wanted them for my records.

Q. And how did you communicate with Ms. Landa about getting those closing documents?

A. By phone. I don't think I said -- we were talking maybe over the phone.

Q. Okay. And what did you -- did she provide those documents to you upon your request?

A. Did not.

Q. What did you have to do?

A. I continually kept asking her about the

closing papers.  I wanted to see copies of the closing papers.

Q.    And did you finally get them?

A.    Finally got an abstract with a warranty deed as a cover letter, which was not what I requested.

Q.    Okay.

A.    I requested the closing papers on the house.

MR. OCHOA-CRONFEL:  There's an objection to this, Your Honor.

MR. SCARBOROUGH:  Is this one exhibit or two?  It's just the --

MR. OCHOA-CRONFEL:  It's the big one along with the warranty deed.

MR. SCARBOROUGH:  Right.  That's all one exhibit?

MR. OCHOA-CRONFEL:  Yes, sir.

MR. SCARBOROUGH:  Your Honor, again, my objection to this is that this is the material that was mailed to him.  And if you'll turn to the second page, the relevance I think that they want to argue is that this shows evidence of fraud because his name is stricken on the warranty deed.

There's no evidence that my client did

that.  In fact, she's testified she didn't do it. And it goes to the merits of the case of whether this is a -- this is a loan, as the plaintiff says, or whether it's a gift as the defendant said.  I don't think it has any bearing on today's hearing.

I object to it for relevance.

MR. OCHOA-CRONFEL:  Your Honor, I'm not using it to show the fraud.  I'm not going to the merits.  That's not my purpose.

My purpose is to show contacts as required under the case law.  Contacts -- this does constitute a contact when communicating with my client over U.S. mail and sending closing documents related to the purchase of the property for which he provided the loan.

So this shows continuous systematic contacts --

THE COURT:  Overruled.

8 will be admitted.

*(Plaintiff's Exhibit No. 8 admitted.)*

Q.    (BY MR. OCHOA-CRONFEL)  Okay.  All right. So, Mr. Farris, can you please identify Exhibit No. 8?

A.    This is a copy of the envelope that this abstract came in.  This is not really what I

requested, but this is what was sent after three months of me continually asking for closing papers.

Q. Okay. And did that include a copy of the warranty deed?

A. It has a copy of the warranty deed on it, yes.

Q. Okay. All right. And when you -- when you saw that warranty deed, how -- how did you feel?

A. I -- I mean, the wind was just kind of let out of my sails on the whole deal because --

MR. SCARBOROUGH: Objection to the relevance of how he felt when he saw the deed because it goes to the merits of the case.

THE COURT: Sustained.

Q. (BY MR. OCHOA-CRONFEL) Okay. And after you received this, did you continue to have communications with Ms. Landa?

A. Yes.

Q. What were those communications in the form of, generally? How were you communicating with her?

A. Well, after receiving that, the main communication was, What happened? Why am I not on this deed?

Q. Okay.

A. Why am I not on the title?

Q.    Okay.  All right.  Can you please identify Exhibit No. 9?

A.    This is a check received from Karen.

Q.    Okay.

MR. OCHOA-CRONFEL:  May I offer it in evidence, Your Honor?

MR. SCARBOROUGH:  No -- no objection.

THE COURT:  No. 9 will be admitted.

*(Plaintiff's Exhibit No. 9 admitted.)*

MR. OCHOA-CRONFEL:  I don't think I offered No. 8.

THE COURT:  You did.  I already introduced it.

MR. OCHOA-CRONFEL:  Okay.  Thank you, Your Honor.

Q.    (BY MR. OCHOA-CRONFEL)  I'm sorry, Mr. Farris; can you --

A.    This is a check that Karen brought to me as a partial payment on the down payment that I loaned her on the house.

Q.    Now, you heard her testify during her testimony that this was not a payment but this was a gift to you.

A.    That is ridiculous.  No, it was not.

Q.    Okay.  Were you in financial trouble at the

time that you got this money?

A. Absolutely not.

Q. Okay. All right. And when she gave this to you, did she send it to you by mail? Did she hand it to you? What were the circumstances of that?

A. We had talked over the phone and she said she was coming to Austin and she had a check for me.

Q. Okay. And she handed you that check?

A. She came to my house and had a check for me.

Q. Okay. All right. And you said she came to Austin. What did she come to Austin for?

A. She came for a birthday party, I believe.

Q. For a party?

A. Yes.

Q. Okay. Now, after you got this check, did you have -- continue having communications with Ms. Landa?

A. I did.

Q. What did those -- what form did those communications take? Telephone?

A. Well, I received the check, but at that point in time I was hoping that it was going to be for more. It was not anywhere close to what she had owed me, so ...

Q.    But what I asked you, Mr. Farris, was after you received the check --

A.    Yes.

Q.    -- I understand you were disappointed about the check.  But after you received the check, did you continue, thereafter in time, to have communications with Ms. Landa?

A.    Yes.  Yes.

Q.    In what form were those communications?

A.    By phone normally.

Q.    Okay.  And what were you talking about when you talked to her over the phone?

A.    Usually it was by e-mail.  It was mainly where is the rest of the money for the down payment --

Q.    Okay.

A.    -- on the house.

Q.    And --

A.    But this was continual.

Q.    Okay.  And had you expected to be paid by then?

A.    Yes.

Q.    Why?

A.    Because her mom had passed and she promised me that in that passing that I would be paid back.

Q.   And you would be paid back from what?

A.   The loan of the money --

Q.   Okay.

A.   -- on the house.

Q.   All right.  Now, here we are, May of 2012, you get a check.  You have communications with her afterwards.  Ms. Landa comes -- and she previously testified that she came to visit in 2013?

A.   That is true.

Q.   Okay.  And did you see her when she came to visit in 2013?

A.   I did.

Q.   Okay.  Did you-all talk about the loan in 2013?

A.   Yes.

Q.   Okay.

A.   We did.

Q.   Okay.  Were you still asking to be paid back?

A.   Yes.

Q.   Okay.  And when she left to go back to Iowa after that week visit in 2013, did you -- did you have any communications with her?

A.   Yes.

Q.   Okay.  And what -- what did those

communications consist of?

A.   Well, we talked about her coming back to Austin.  She wanted to move back to Austin.  It was her home.  That's where she wanted to be.  And she -- that week she had an interview, but she went back to sell her house.

Q.   Okay.  And did you talk about the loan?

A.   Yes.

Q.   Okay.  And did she sell her house?

A.   She did.

Q.   Okay.  What happened when she sold her house?

A.   She moved to Austin.

Q.   And were you involved in that move in any way?

A.   I did help her move.  Correct.

Q.   Okay.  And --

THE COURT:  So she sold the house that you gave her money --

THE WITNESS:  Escalade Court, yes.

THE COURT:  Okay.

Q.   (BY MR. OCHOA-CRONFEL)  And after she sold the house, she moved.  Did you have discussions with her about paying you back?

A.   I did.

Q. Okay. And what was her response?

A. That she would -- she would pay me back when the house sold, that -- out of that money because she had already spent all the money from the inheritance -- or the life insurance policy of her mom.

MR. SCARBOROUGH: Again, Your Honor, this -- all of this testimony about the life insurance and about this goes to the merits of the case, and we're not trying that today.

Object to it on -- based on relevance.

THE COURT: Sustained.

Q. (BY MR. OCHOA-CRONFEL) Okay. So did -- did you continue to have communications after she moved to Austin in 2013, July 2013, after she sold the house?

A. We did.

Q. Okay. Did she pay you?

A. No.

Q. Okay. And she was here from, she testified, from June, July or August of 2013 through April of 2014. Correct?

A. Right. She lived with --

Q. Did you-all -- did you see her while she was here?

A.    Yes.

Q.    Okay.  And did you all spend any time together?

A.    We did.

Q.    Okay.  And when you -- can you describe to the Court -- did y'all have communications --

A.    We had --

Q.    -- during that time about your loan?

A.    -- we had communications on a daily basis.

Q.    Did you talk about the loan?

A.    We did.  But every time I'd bring it up, she would throw a fit.

                MR. SCARBOROUGH:  Again, Your Honor, we're continuing -- this goes --

                THE COURT:  Sustained.

                MR. SCARBOROUGH:  -- to the merits of the --

                THE COURT:  Sustained.

Q.    (BY MR. OCHOA-CRONFEL)  Okay.  All right.  Now, the testimony is that in April of 2014 she left and went back to Iowa, right, more or less?

A.    What day?

Q.    April of 2014.

A.    That's true.

Q.    Okay.

A. True.

Q. Okay. Did you have communications with her up and to that point about --

A. A couple months before she moved, we -- I hadn't talked with her. I didn't know she was moving. She didn't tell anybody she was moving.

Q. All right. So up -- would it be fair to say that up and to this day you've had communications with her about getting your loan paid back?

A. Yes.

Q. Okay. Do you have anything else you want to tell the Court, Mr. Farris?

A. That's pretty much it.

MR. OCHOA-CRONFEL: Pass the witness.

THE COURT: Mr. Scarborough?

MR. SCARBOROUGH: Very briefly.

**CROSS-EXAMINATION**

BY MR. SCARBOROUGH:

Q. Mr. Farris, we exchanged depositions on Tuesday of this week.

A. Yes.

Q. You have a college degree in business and marketing, do you not?

A. That is correct.

Q. And you've been in business here for over

30 years.

A.    That is correct.

Q.    And you admitted in the deposition that this suit is because you made a loan -- for what you call a loan to your ex-wife for her to buy the condo and that's what this lawsuit is all about.

A.    That is correct.

Q.    You admit that there was no discussion on providing money for an Iowa house prior to her moving to Iowa in October of 2010.

A.    That's true.

Q.    And you agree that the -- that the first time you ever heard or talked about providing money for a closing, whether it was a loan or a gift, was at the December meeting in Dallas.

A.    That's true.

Q.    And your testimony about the Dallas meeting is that you never discussed it before then, and that wasn't the purpose of getting together in Dallas, was it?

A.    No.

Q.    In fact you told me in your deposition that you met in Dallas to spend time together, and there was no agenda.

A.    There was really no agenda.  We just agreed

to meet in Dallas.

Q. And, as your words were, spend time together.

A. That's part of it, yes.

Q. As a couple.

A. As a couple.

Q. Stayed in the same hotel room?

A. Yes.

Q. And went to dinner and acted like a couple.

A. That is true.

Q. Okay. You've already said I believe here you didn't know how much money was going to be needed. Correct?

A. That's right.

Q. House had not been identified. Correct?

A. That's true.

Q. You were talking generically about providing money for a house funding, but it was not the focus of the weekend. That was your testimony; isn't that true?

A. That's true, starting out.

Q. And then when I asked you what the focus was, you told me, was just to get together and enjoy each other's company and have a good time in Dallas. Isn't that your testimony?

A.    That's basically true.

Q.    And that's what you said in your deposition, and that's what you're saying here.

A.    That's right.

Q.    You admit to communicating with the bank and providing financial information on yourself to the bank and to your wife, do you not -- to your ex-wife?

A.    I'm sorry?  Repeat that.

Q.    You admit that you communicated with the bank that closed this transaction in Iowa, and you provided financial information to them directly and through your ex-wife.

A.    That is true.

Q.    You admit that the funeral she came back for to bury her mother's ashes in the spring of 2012 had nothing to do with this business transaction.

A.    That's true.

Q.    You admit that when she came back in May of 2012, that she came for the birthday of her 80-year-old friend and for her son and that was the purpose of her coming back and had nothing to do with this loan -- that you call a loan that funded the house; isn't that true?

A.    Not exactly true.

Q. Well, let's -- that was a lot, so let's cover it.

I understand that she gave you a check. She doesn't deny that. But you testified in your deposition that she came back because of the birthday of her friend and because her son's birthday was at that time.

A. That was her main reason.

Q. Okay. And in June of '13 when she came back, she came back, not for purposes of this transaction, but she came back because she was looking into the possibility of moving, isn't that true, to -- moving to Austin?

A. That was part of it, yes.

Q. And that was why she came back, to consider -- because she was thinking about reconnecting with her kids and maybe moving to Austin. True?

A. That's true.

Q. And then in July when she did come back, July of '13, she came back -- her primary reason for coming back was because your son had been -- had become engaged. He was going to be married in February. And she wanted to renew her relationship with her son and be part of those weddings?

A.     That's partly -- part of it, yes.

Q.     That's why she came back, isn't it?

A.     She came back to Austin to live.

Q.     Right.  And she came back to be part of those wedding plans; isn't that true?

A.     She wanted to go to the wedding.

Q.     Well, you want me -- I can give you the page number.  On Page 48, Line 3 --

A.     Well, she did come back the Austin to be part of the wedding.  That's true.  That's -- that is true.

Q.     Okay.  And that's what you said in your deposition; that's why she came back.

A.     That's not the only reason she came back.

Q.     I didn't ask you that.  What you said in the deposition is she wanted to renew her relationship with her son, Tyler, who was engaged at the time.  Isn't that what you said?

A.     Definitely.  She did.

Q.     Okay.  And when she moved back to Texas in July of '13, she left all of her belongings in Iowa, didn't she?

A.     Repeat that.

Q.     When she came back to Texas in July of '13, all of her belongings, furniture and the stuff like

that, other than clothes and things she needed, stayed in Iowa.

A.    Most of it did.

Q.    And while there was no mention of remarriage, you did establish a relationship with her.  In fact, you said -- your words were, We were a couple.  Right?

A.    We were.

Q.    And in terms of the exhibit, the number of which --

MR. SCARBOROUGH:  Which was this?

MR. POTTER:  8, Plaintiff's Exhibit 8.

Q.    (BY MR. SCARBOROUGH)  Plaintiff's 8, which is this big document --

MR. SCARBOROUGH:  May I approach, Your Honor?

THE COURT:  Yes.

Q.    (BY MR. SCARBOROUGH)  The second page of that exhibit has a warranty deed.  And in there your typed name -- her name is in there, and it says, "and Charles Lee Farris, both single, as joint tenants with rights of survivorship and as tenants in common," and that's struck out.  You don't have any personal knowledge of who struck that, do you?

A.    I don't.

Q.    Okay.

A.    But I didn't know about it before closing, so ...

MR. SCARBOROUGH:  Objection; nonresponsive.

THE COURT:  Sustained.

Q.    (BY MR. SCARBOROUGH)  You admit, sir, that after she quit going to UT in around 1980, and that 30 years until she left in the summer of 2010, that those contexts, whatever you want to talk about, divorces, marriages, birth of children, insurance, everything, that was while she lived in either Travis or Williamson County, and those contexts all are because she was here living at that time.  Right?

A.    What was that all about --

Q.    I'm trying to get you to --

MR. OCHOA-CRONFEL:  I'm going to object to that because he's asking Mr. Farris about the state of mind of the defendant.  And so he can't -- he's not going to be able to speak to that, what her --

MR. SCARBOROUGH:  I'll rephrase the question.  I'll rephrase the question.

Q.    (BY MR. SCARBOROUGH)  What I'm trying to get you to admit to this Court is that that

systematic context, and everything you -- whatever you want to call it, for a period of 30 years, from 1980 until the summer of 2010, didn't have anything to do with this transaction.

MR. OCHOA-CRONFEL: I'm going to object to that, Your Honor --

Q. (BY MR. SCARBOROUGH) Did it?

MR. OCHOA-CRONFEL: -- because he's also asking him to make a legal conclusion. I'm going to object to that.

MR. SCARBOROUGH: We know he's not a lawyer.

THE COURT: Overruled.

You can answer that.

Q. (BY MR. SCARBOROUGH) That 30 years didn't have anything to do with the transaction that developed -- that you said for the first time you heard about it in December of --

A. Well, I think it did.

Q. Beg your pardon?

A. I think so. I think it did.

Q. You think that 30 years does relate to --

A. Definitely.

Q. Okay. I'm going to do something most lawyers are not supposed to do. Tell the Court how

that 30 years relates to the transaction that you heard about for the first time in December of 2010?

A. We were good friends. We kept in communication all the time. We never let go of each other.

Q. Okay.

A. This was part of it.

Q. Okay.

A. I was going to help her buy a house, but I could not give her the money. It was a loan.

Q. I understand that's your position.

A. Okay.

Q. You know that there is reference in documents to there being a gift letter.

A. There is.

Q. Do you know that?

A. I know it now.

Q. Right.

A. This was never a gift.

Q. We may have to take this out of the deposition book. I'm not sure we had anticipated this.

MR. SCARBOROUGH: May I approach the witness?

THE COURT: Yes, you may.

Q.    (BY MR. SCARBOROUGH)  I'm going to hand you what was marked in the deposition as Deposition Exhibit 8, and I'm going to have it marked as the Defendant's Exhibit 5 for purposes of this.

And this is an e-mail from Yvonne Silvers.  That's the lady you were dealing with.

A.    Correct.

Q.    And it's to Ms. Landa.

A.    Uh-huh.

Q.    And while you're not copied on it -- and I'm not saying you were -- it references a gift letter from you, and it says, I don't know if this helps, but the gift letter from --

MR. OCHOA-CRONFEL:  Your Honor, I'm going to object to this, and I'm going to object to it because it's the very thing that Mr. Scarborough has been objecting to the whole time.  This goes to the merits.  It has nothing to do with --

THE COURT:  You mean, all those objections that I've overruled, those objections?

MR. OCHOA-CRONFEL:  Okay.

THE COURT:  Overruled.

Q.    (BY MR. SCARBOROUGH)  This references -- says, "The gift letter from Lee is the only -- is only for the file basically saying it does not need

to be repaid.  Nothing from us is reported to the IRS.  Since we have an -- we have you open a primary checking account anyway, what if he deposits those funds from him to you into that joint account."

So there is at least some evidence -- and if we also turn -- let me finish that sentence. There's some evidence that there was a gift letter. And I know you say you didn't sign one, but there's some evidence that there was one, isn't there?

A.    From -- not to me.

Q.    Right.

A.    That was hidden from me, that whole e-mail.

Q.    I understand that you say it was.  I'm just talking about whether there was -- was or was not a gift.

In Deposition Exhibit 9 to Ms. Landa's deposition, which will be the Defendant's Exhibit 6 for purposes of this --

MR. SCARBOROUGH:  Brian, you have to keep track of that for me.

MR. POTTER:  I've got it.

Q.    (BY MR. SCARBOROUGH)  -- is the Uniform Residential Loan Application.  It says final.  And as part of that closing transaction, there is a reference to a gift from Lee Farris in the amount of

$82,000; isn't there?

A. I see that now.

Q. Okay.

MR. OCHOA-CRONFEL: Your Honor, I'm going to object again. We're getting to the merits of the issue for which Mr. Scarborough was objecting all afternoon -- been objecting all morning.

THE COURT: Why is this relevant, Mr. Scarborough?

MR. SCARBOROUGH: Because it -- it goes to the same argument I'd say for him; what's good for the goose and is good for the gander.

THE COURT: Overruled.

MR. SCARBOROUGH: We'll offer those two exhibits, 5 and 6 into evidence.

A. That was hidden from me. I never saw it.

MR. SCARBOROUGH: Objection; nonresponsive.

THE COURT: Do we have 5 and 6?

THE REPORTER: No.

THE COURT: 5 and 6?

MR. POTTER: Yes, ma'am.

MR. SCARBOROUGH: We will -- we will --

THE COURT: I cannot introduce them

unless I have them.  Call me crazy.

MR. SCARBOROUGH:  I'm not about to call this Court crazy.

*(Discussion off the record.)*

MR. SCARBOROUGH:  Exhibits 5 and 6, and I tender to the Court.

THE COURT:  Any objections?

MR. OCHOA-CRONFEL:  Yes.  I'm going to object to it as being irrelevant, goes to the merits of the case, and doesn't have anything to do with contacts or jurisdiction.

THE COURT:  Overruled.

5 and 6 will be admitted.

*(Defendant's Exhibits Nos. 5 and 6 admitted.)*

MR. SCARBOROUGH:  Pass the witness.

THE COURT:  Anything else?

You've got two minutes left.

MR. OCHOA-CRONFEL:  Yes, ma'am.  May I see those exhibits?

THE COURT:  The last two?

MR. OCHOA-CRONFEL:  Yes.

THE COURT:  Yes.

**REDIRECT EXAMINATION**

BY MR. OCHOA-CRONFEL:

Q.    Mr. Farris, looking at Exhibits No. 5 and No. 6, do you remember that Ms. Landa in her testimony said that you had all the information that she did during the closing process?  Do you remember that --

A.    I remember that.

Q.    -- as she was sitting up there?

Is that true?

A.    That is not true.

MR. SCARBOROUGH:  Objection, Your Honor; goes to the merits.

MR. OCHOA-CRONFEL:  Okay.

MR. SCARBOROUGH:  Objection; it goes to the merits.

THE COURT:  Overruled.

Q.    (BY MR. OCHOA-CRONFEL)  Okay.  Now, you see those -- those two exhibits that have just been introduced?

A.    Yes.

Q.    Had you ever seen those before the litigation -- before those documents were produced in litigation, had you ever seen any of those?

A.    Never.

Q. Was the first time during the course of this litigation that you ever saw that?

A. That's correct.

Q. You weren't included in any correspondence --

MR. SCARBOROUGH: Objection; leading.

Q. (BY MR. OCHOA-CRONFEL) -- related to --

MR. SCARBOROUGH: Objection; leading, suggesting the answer.

THE COURT: Sustained.

Q. (BY MR. OCHOA-CRONFEL) Were you included in any correspondence related to any gift at any time as a characterization of this --

A. No.

Q. -- loan that you gave Ms. Landa?

A. No.

Q. Okay. All right.

Now, in Dallas, Mr. Scarborough -- Mr. Scarborough is asking -- was asking you what the focus of that meeting was, and he made reference to your deposition.

You previously testified that that was the first time you heard about the loan.

MR. SCARBOROUGH: Objection; leading. Objection; leading.

THE COURT: You have minute left.

MR. OCHOA-CRONFEL: Okay.

THE COURT: Overruled.

MR. OCHOA-CRONFEL: All right.

Q. (BY MR. OCHOA-CRONFEL) What happened in Dallas -- well, let me -- strike that.

Was that the first time that you heard about Ms. Landa's need for money as a loan for a down payment on the house?

A. Yes.

Q. Okay.

MR. OCHOA-CRONFEL: That's it. Pass the witness.

THE COURT: Anything else, Mr. Scarborough?

MR. SCARBOROUGH: No, Your Honor.

THE COURT: Okay. You may step down.

THE WITNESS: Okay.

*(Discussion off the record.)*

MR. OCHOA-CRONFEL: And, Your Honor, we're done.

THE COURT: Okay.

MR. OCHOA-CRONFEL: We rest.

THE COURT: Okay.

MR. SCARBOROUGH: The defendant rests



PLAINTIFF'S EXHIBIT NO. 1

Lande
7685 Excalade
WDM, Iowa 50266

DES MOINES IA
01 JUN 2013 PM 1 L

Lee Farr

Austin TX 78-



PLAINTIFF'S
EXHIBIT
1

FARRIS 0205

Lee—

This note is to confirm your generosity of money used to buy my house. As of today, I have paid you, $15,000 in 2012. The $10,000 is a loan to be paid back to you. I thank you for your love + support throughout my life. I do not have figures from the

home closing we from 02/2011 but hopefully will suffice.

Always,
Karen [illegible]
5/29/13

FARRIS 0206

PLAINTIFF'S EXHIBIT NO. 6

LEE FARRIS

H

Combined Statement
Page 2 of 6
Statement Period
02-08-11 through 03-11-11
H 06 0 A P PA 6
Number of checks enclosed: 0

## Adv Tiered Interest Chkg

LEE FARRIS

## Your Account at a Glance

| Account Number | | |
|---|---|---|
| Beginning Balance on 02-08-11 | $ | 11,429.66 |
| Deposits and Other Additions | + | 22,180.65 |
| Checks Posted | - | 3,507.02 |
| Service Charges and Other Fees | - | 25.00 |
| Other Subtractions | - | 22,214.16 |
| Ending Balance on 03-11-11 | $ | 7,864.13 |

Interest Paid Year to Date: $2.64

## Your Total Qualifying Balance Is Based on the Following Accounts

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Adv Tiered Interest Chkg | | | | 03-10 |
| Adv Tiered Interest Chkg | | | | 03-10 |
| Fixed Term CD | | | | 02-24 |
| Fixed Term CD | | | | 03-10 |
| 18M Opt-Up CD | | | | 03-10 |
| 12M Featured CD | | | | 03-10 |
| Home Equity Line of Credit | | | | 03-10 |
| Installment Loan | | | | 03-10 |
| Mortgage/Home Equity Loan | | | | 03-09 |

TheEffectiveEdge
Transforming the Way Work Gets Done.

Thank you for banking with us. The monthly
customer who maintained a qualifying balance.

...vantage

## Adv Tiered Interest Chkg Additions and Subtractions

| Date Posted | Amount($) | Resulting Balances($) | Transactions |
|---|---|---|---|
| 02-08 | 1,500.00- | 9,929.66 | Check 5959 |
| 02-22 | 296.00- | 9,633.66 | Check 5960 |
| 02-23 | 1,000.00- | 8,633.66 | Check 5962 |
| 02-23 | 34.30- | 8,599.36 | Lincoln Benefit Des:Ck4Inspymt ID:0100892347 Indn:Lee Farris Co ID:1470221457 Ppd |
| 02-24 | 22,179.86+ | 30,779.22 | Counter Credit |
| 02-24 | 22,179.86- | 8,599.36 | Wire Type:Wire Out Date:110224 Time:1540 Et Trn:2011022400271950 Service Ref:010032 Bnf:Charles L Farris ID:857084 Bnf Bk:Bankers Trus T Company ID:073000642 Pmt Det:01110224006339Nn WI R/Attn Patsy Blasik |
| 02-24 | 25.00- | 8,574.36 | Wire Transfer Fee |
| 03-01 | 711.02- | 7,863.34 | Check 5961 |
| 03-11 | 0.79+ | 7,864.13 | Interest Earned |

*22,179.86*
*25.00 fee*
*22,204 86*

PLAINTIFF'S
EXHIBIT

FARRIS 0001



PLAINTIFF'S EXHIBIT NO. 7

# CHASE O

JP Morgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

002205 DRE 201 141 06511 - NNNNNNNNYNNN T 1 000000000 00 0000

CHARLES L FARRIS

February 09, 2011 through March 09, 2011

Primary Account

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Hearing Impaired: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

## CONSOLIDATED BALANCE SUMMARY

### ASSETS

**Checking & Savings**

| | ACCOUNT | BEGINNING BALANCE THIS PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|---|
| Chase Premier Checking | | $72,870.45 | $5,840.78 |
| Total | | $72,870.45 | $5,840.78 |

**CD & Retirement**

| | ACCOUNT | INTEREST RATE/ APY* | MATURITY DATE | BEGINNING BALANCE THIS PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|---|---|---|
| CD | | 0.60% 0.60% | 02/25/12 | 20,931.07 | 20,931.07 |
| Balance plus Interest Earned Not Paid $20,947.12 | | | | | |
| Total | | | | $20,931.07 | $20,931.07 |

* The Annual Percentage Yield (APY) for your CD / Retirement CD is calculated using the term and deposit amount as of the issue / renewal date or maintenance effective date. The APY assumes interest will remain on deposit until maturity.

| TOTAL ASSETS | $93,801.52 | $26,771.85 |
|---|---|---|

All Summary Balances shown are as of March 8, 2011 unless otherwise stated. For details of your retirement accounts, credit accounts or securities accounts, you will receive separate statements. Balance summary information for annuities is provided by the issuing insurance companies and believed to be reliable without guarantee of its completeness or accuracy.



PLAINTIFF'S EXHIBIT

FARRIS 0002

# CHASE ○

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

CHARLES L FARRIS                                    Account Number: ████████

## CHECKING SUMMARY

| | AMOUNT |
|---|---|
| Beginning Balance | $2,870.18 |
| Deposits and Additions | 70,000.30 |
| Ending Balance | $72,870.48 |
| | |
| Annual Percentage Yield Earned This Period | 0.01% |
| Interest Earned This Period | $0.28 |
| Interest Paid Year-to-Date | $0.30 |

Interest paid in 2010 for account ████████ was $0.24.

Good News. Your Chase Premier Checking monthly service fee was waived because you kept an average combined deposit and investment balance of $75,000 or more in qualifying accounts during the statement period.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/10 | Interest Payment | $0.02 |
| 01/28 | Deposit     814728239 | 70,000.00 |
| 02/08 | Interest Payment | 0.28 |
| **Total Deposits and Additions** | | **$70,000.30** |

# CHASE

CHARLES L FARRIS                                Account Number:

## CHECKING SUMMARY

| | AMOUNT |
|---|---|
| Beginning Balance | $72,870.45 |
| Deposits and Additions | 0.33 |
| Electronic Withdrawals | - 67,000.00 |
| Fees and Other Withdrawals | - 30.00 |
| Ending Balance | $5,840.78 |
| | |
| Annual Percentage Yield Earned This Period | 0.01% |
| Interest Earned This Period | $0.33 |
| Interest Paid Year-to-Date | $0.63 |

Interest paid in 2010 for account ███████████ was $0.24.

This message confirms your enrollment in the Classic Benefits Package.

Good news. Your Chase Premier Checking monthly service fee was waived because you kept an average combined balance of $15,000 in qualifying checking, savings, credit, securities and mortgage loan accounts during the statement period.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 09/08 | Interest Payment | $0.33 |
| **Total Deposits and Additions** | | **$0.33** |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/25 | 02/25 Fedwire Debit Via: Bk CO Des Moines/073000642 A/C: Charles L Farris Imad: 0225B1Qgc01C006188 Trn: 1526600056Es | $67,000.00 |
| **Total Electronic Withdrawals** | | **$67,000.00** |

## FEES AND OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 02/25 | Outgoing Domestic Wire Fee | $30.00 |
| **Total Fees & Other Withdrawals** | | **$30.00** |

FARRIS 0004

**CHASE O**

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

Illustrated mailing barcode lines

600 18394 DRE 201 141 64011 - YNYNYNYNNNT 1 000000000 00 0000

CHARLES A FARRIS

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | Chase.com |
| Service Center: | 1-800-935-9935 |
| Hearing Impaired: | 1-800-242-7883 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

## CONSOLIDATED BALANCE SUMMARY

### ASSETS

**Checking & Savings**

| | ACCOUNT | BEGINNING BALANCE THIS PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|---|
| Chase Premier Checking | ▓▓▓▓▓ | $2,870.15 | $72,870.45 |
| Total | | $2,870.15 | $72,870.45 |

**CD & Retirement**

| | ACCOUNT | INTEREST RATE / APY* | MATURITY DATE | BEGINNING BALANCE THIS PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|---|---|---|
| CD | ▓▓▓▓▓ | 0.60% 0.60% | 02/25/12 | 96,769.10 | 20,931.07 |
| Balance plus Interest Earned Not Paid $20,937.46 | | | | | |
| Total | | | | $96,769.10 | $20,931.07 |

* The Annual Percentage Yield (APY) for your CD / Retirement CD is calculated using the loan and deposit amount as of the issue / renewal date or maintenance effective date. The APY assumes interest will remain on deposit until maturity.

| TOTAL ASSETS | $99,639.25 | $93,801.52 |
|---|---|---|

All Summary Balances shown are as of February 8, 2011 unless otherwise stated. For details of your retirement accounts, credit accounts or securities accounts, you will receive separate statements. Balance summary information for annuities is provided by the issuing insurance companies and believed to be reliable without guarantee of its completeness or accuracy.

FARRIS 0005



PLAINTIFF'S EXHIBIT NO. 9





**05/16/2012 1006 $15,000.00**  **05/16/2012 1006 $15,000.00 (Back)**



PLAINTIFF'S
EXHIBIT
9

LANDA 0151